Angelo J. **CEFALO** et al., Plaintiffs,

v.

The **INTERNATIONAL UNION OF DISTRICT 50 UNITED MINE WORKERS OF AMERICA** et al., Defendants.

Civ. A. No. 3616–69.

United States District Court,
District of Columbia.

March 25, 1970.

---

Stephen Daniel Keeffe, pro hac vice, and John H. Frye, III, Washington D. C., for plaintiffs.

J. C. Wells, Jack Weiner, Washington D. C., for defendants.

## MEMORANDUM OPINION

PARKER, District Judge.

The International Union of District 50, United Mine Workers of America (hereinafter called District 50) and its President, Elwood Moffett, are defendants in a Complaint filed by certain International Officers and staff officials, all members of the Union, who allege violations of the Labor-Management Re-

porting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. Sec. 401 et seq.

The plaintiffs Angelo J. Cefalo, William J. Foley and John J. Badoud are candidates for the international offices of President, Vice-President and Secretary-Treasurer, respectively. They have formed a slate (hereinafter called CFB slate) and seek to be elected under a referendum vote of the Union membership scheduled for May 12, 1970. The remaining plaintiffs, supporters of the slate, are members of and are employed by the Union as Regional Directors, Assistant Regional Directors, International Representatives, or Special Representatives.

The defendant, District 50 is a labor organization within the meaning of the above statute. The defendant, Elwood Moffett, is the incumbent President of District 50 and also a candidate for re-election.

In mid-November 1969, plaintiffs Cefalo, Foley and John J. Badoud announced officially their candidacy for the three international offices. On December 23, 1969, plaintiffs filed with this Court their complaint, application for temporary restraining order, and motion for a preliminary injunction against the Union and its President alleging that provisions of LMRDA had been violated by Moffett and that rights guaranteed to them as members and officers under the Act had been denied by him, all resulting from their support of an opposition slate of candidates.

The plaintiffs sought an injunction against Moffett and the International Union, prohibiting certain allegedly improper actions, a declaratory judgment defining Moffett's powers as President and damages.

On January 29, 1970, after a hearing, Judge Sirica of this Court issued a preliminary injunction together with findings of fact and conclusions of law and an accompanying order. Those findings were not conclusive (Findings 10, 14, 19, 23, 26, 31, 33, 36, 38, and 39) but stated that they were the plaintiffs' contentions.

The defendants promptly appealed to the United States Court of Appeals for the District of Columbia Circuit requesting, among other things, a stay of that Order. On February 5, 1970, after argument, the Appellate Court entered a per curiam order denying the stay. It ruled, however, "In view of the urgency to have this matter finally decided on a full record, pending the appeal from the preliminary injunction we remand the record in this case back to the District Court for a trial and decision on the merits forthwith."

The actions which form the gravamen of the plaintiffs' charges may be grouped under three classifications: (1) decisions of Moffett, affecting personnel which were a denial of equal rights, free speech and in effect "reprisals" against the plaintiffs because of their political activity in support of candidates for office; (2) a breach by Moffett of the fiduciary duty to manage the Union's affairs for the benefit of the membership by dividing or "gerrymandering" Regions for the benefit of his political campaign; (3) use of Union funds by Moffett to promote his candidacy in the scheduled election.

Plaintiffs claim violations of Title I, Sections 101(a) (1), (2) and 102; Title IV, Section 401(e), (g); Title V, Section 501(a), (b); Title VI, Section 609 of the Act. [29 U.S.C. Sections 411(a) (1), (2), and 412; Section 481(e), (g); Section 501(a), (b); Section 529].

For reasons which follow, the Court finds that the decisions of Moffett affecting the official rank and assignment of certain plaintiffs violated their rights as guaranteed under LMRDA. However, as to the remaining charges the Court finds that the plaintiffs did not meet the burden of proof.

I

First to be considered are the directives of Moffett effecting changes in personnel which the plaintiffs claim

denied them equal rights and privileges and the freedom of speech and assembly.

They assert that certain personnel actions by the defendant Moffett were in fact "reprisals" because of their active advocacy of the slate of officers challenging Moffett's leadership at the election scheduled for May 12, 1970. Specifically, it is alleged that Joseph De Falco and Joseph A. Gentile, Jr. were demoted from their position as Regional Directors to lesser assignments; Burlie E. Sizemore, an Assistant Regional Director, was transferred to another region without justification; Dale T. Badoud, an International Representative, was reassigned without justification by his Regional Director who was a Moffett supporter; Edward J. Galuszka, an International Representative, was wrongfully dismissed upon refusing to accept an assignment out of his region.

In this same connection, plaintiffs also contend that in the area where Frank Crise was Regional Director, that Moffett, without justification and contrary to established practice, instituted personnel changes without consultation and otherwise infringed on his prerogatives as Regional Director.

The Constitution of District 50 defines the authority of the President with respect to personnel actions.[1] He is permitted to fill all vacancies occurring in any International Office; to suspend or remove any International Officer or appointed employee for insubordination or cause; to appoint Regional Directors, International Representatives and other field and office workers as he may determine necessary to conduct the Union's affairs. (Article VII, Sections 2, 3 and 4).

Further, the Constitution provides that all of such appointments, suspensions and removals from office by the President are subject to the approval of the International Executive Board. (Article VII, Section 12).

With respect to the plaintiffs De Falco, Gentile, and Sizemore the Court rejects the justification given by Moffett for their demotions and transfer and finds that from the record the preponderance of the testimony and evidence demonstrates that such actions were, in fact, "reprisals" resulting from their political activity. No merit is found in the Badoud and Galuszka claims. The Court finds that the Crise complaints are substantiated by the record.

### The Demotion of Joseph De Falco

De Falco was demoted from the directorship of the Chicago, Illinois Region and reassigned as a Special International Representative.

He was first employed as an International Representative in 1964, and within a span of six years received successive promotions to Special Representative, Assistant Regional Director and Regional Director. All assignments were in the Chicago, Illinois Region.

This plaintiff declared his support of the CFB slate at a mid-November meeting of his Chicago staff. Within a week thereof Moffett demoted him to the position of Special International Representative.

The stated reasons for the demotion are tenuous. Moffett claimed that dissension between De Falco and Harold J. Penney who had preceded him as the Director of the Chicago Region prompted the decision. De Falco testified that Moffett claimed that he (Moffett) had moved him a little bit "too fast" so he was being sent back to the position of Special Representative—a suggestion of inexperience.

In this connection, it should be noted that when De Falco was appointed director his immediate predecessor, Penney, remained in the Region as Assistant to the President. At the same time there was an understanding between Moffett and Penney that Penney would assist

1. Constitution of International Union of District 50, United Mine Workers of America (April 7, 1965).

and otherwise give guidance to De Falco. The unfortunate part of this arrangement was that at no time did Moffett make this known to De Falco, and the evidence does show that De Falco requested on at least one occasion that Penney be removed from the Region. The Court notes, however, that neither Penney nor Steve Pavlik, called as witnesses by the defendant, testified to any dissension.

Over against this was the believable testimony of other members of the Chicago staff together with a letter of support to Moffett from several of the Chicago staff indicating that De Falco was an effective director who maintained good relationships with the staff and members of the Union, and otherwise denying any dissension between De Falco and Penney, which might have impeded the operations within the Chicago Region. Nor was there any testimony and evidence of any prior notice or communication to De Falco pointing out any unsatisfactory performance on his part or dissension.

Considering all the testimony and evidence relating to De Falco's demotion the Court cannot accept at face value the reasons given by Moffett but believes that the demotion was clearly precipitated by De Falco's support of the opposition slate.

### The Demotion of Joseph Gentile, Jr.

Plaintiff Gentile was demoted from the Directorship of the Syracuse, New York Region and made Special International Representative. The official notice of his demotion from Moffett recited that he had failed to improve the membership status of his region as compared with the Union's normal membership growth.

Employed as a member of the Union's field staff for approximately 15 years, his earlier assignments included International Representative, and Assistant Regional Director. He had served as Regional Director in the Syracuse, New York office since December 1, 1967.

The testimony showed that several days prior to November 13, 1969, the date of the official announcement of the CFB slate, Moffett, together with one Vacarella, an Assistant to the President, visited the Syracuse Office and among other things inquired as to what support Moffett could expect from that area. At that time Gentile had not announced his support of the opposition slate. Several days after, however, at a meeting of one of the locals within his region he and Vacarella addressed the membership of one of the locals, Gentile in support of the CFB slate and Vacarella in support of Moffett's candidacy. Following their presentations, the local endorsed the CFB slate.

Within a few days thereafter Gentile was notified of his demotion by Vacarella. It should be noted that Gentile testified that when Vacarella informed him of the demotion he indicated that it was because of his support of the opposition slate. Vacarella, when called as the defendant's witness, was not questioned about nor did he deny that part of Gentile's testimony.

It is not apparent to the Court, upon weighing all the evidence, that there was any justification for this demotion. The timing of Moffett's decision, when viewed within the sequence of events, strongly suggests a political reprisal. This is particularly true since there was no evidence whatsoever that during the entire (two-year) period Gentile served as Director was any question or criticism of his performance raised by Moffett. In addition, less than 3 weeks before the demotion, on the occasion of a visit to Syracuse Moffett had, indeed, publicly expressed satisfaction with his stewardship. Evidence by the defense based upon a comparison of the membership statistics of the Region for the two-year period immediately preceding Gentile's appointment indicated a decrease of less than 100. But, as brought out and as the Court concludes, the validity of such comparisons may be highly questionable.

*The Transfer of Burlie E. Sizemore*

Sizemore, Assistant Regional Director of St. Louis, Missouri was transferred to Columbus, Ohio. This plaintiff had a long history of employment with the Union and the testimony showed he was an effective staff member, charged with important assignments in St. Louis. He and Crise, the Director of the St. Louis Region were supporters of the CFB slate.

Moffett summarily transferred him to the Columbus, Ohio Region. This action followed on the heels of conversations related by Sizemore in which John L. Oshinski attempted to secure Sizemore's support of the Moffett slate, and during which the latter (Oshinski) related that certain favorable considerations would be given to him (Sizemore) by Moffett for supporting his slate. The Court accepts this testimony as true. (Oshinski, an Assistant to the President and a Moffett supporter, was an important figure in the International Union).

It is significant that the transfer did not occur in the usual manner. There was no prior consultation by Moffett with the Regional Director, nor was the effective date of the transfer made subject to the date Sizemore could be released by his Regional Director: it was "effective immediately." When Crise protested the transfer, listing several upcoming elections and union negotiations for which Sizemore was responsible, Moffett telegraphed that the transfer was urgent and that Crise should stop interfering.

The Court does not feel that the defendants showed any real urgency in the few assignments given to Sizemore in Columbus. Moreover, the record showed that the St. Louis region suffered by Sizemore's absence even though Moffett immediately sent in a substitute, Charles Duty. Hearings were postponed, contract negotiations were dropped and on two occasions Moffett was forced to recall Sizemore temporarily to St. Louis. In the Court's judgment, the reasons given by Moffett why Charles Duty could not have been transferred directly to Columbus and Sizemore left in St. Louis where he was obviously needed were insufficient.

The Court is mindful that at an earlier time and prior to the formation of the CFB slate, Sizemore had expressed a desire to be assigned out of the St. Louis Region. However, in reviewing the entire evidence the Court is of the opinion and finds that justification was entirely lacking for the transfer to Columbus, Ohio. As in the case of De Falco and Gentile, the weight of the evidence shows that Moffett's actions were retaliatory measures.

*Dale T. Badoud and Edward J. Galuszka*

The testimony as it relates to Badoud and Galuszka presents a different picture. The plaintiffs contend that the Badoud transfer and the Galuszka dismissal were a part of the Moffett political scheme. The Court is not persuaded that the record supports such a finding.

Dale T. Badoud, an International Representative and the son of the nominee on the CFB slate was opposed to Moffett's re-election. Prior to September 25, 1969, he served in the Buffalo, New York Regional Office and on that date was assigned to the Kansas City, Missouri Regional Office, a transfer not claimed to be improper. He worked there for several months when he was transferred by his Director to the Oklahoma City, Oklahoma area for organizational work, specifically with an unorganized natural gas company.

Badoud contends that this transfer was a reprisal for his support of the CFB slate and that he was "exiled" to an area where there were no Union members thus preventing any influence that he might have exerted in Kansas City. While he was an active campaigner for his father's slate, the evidence does not support a conclusion that his new assignment was politically motivated. Moreover, the record shows that one of his primary responsibilities was to organize the unorganized. The Court finds that decision of the Regional

Director was justified and without any unwarranted design.

Nor is the Court convinced that the termination of Galuszka's employment by Moffett was the result of political considerations.

This plaintiff was hired in March, 1969, as a temporary employee to assist in organizing efforts in the Boston area. Within several months he was made a permanent International Representative.

In the latter part of October 1969, Moffett directed his transfer from Boston to the Syracuse Regional Office. He was dissuaded from this decision by Galuszka's supervisors in the Boston area who claimed that his services were needed for an important strike then in progress and a scheduled election. In late November Moffett again advised Galuszka of his transfer, this time to Lexington, Kentucky. No reasons were advanced by his superiors to prevent his leaving, but Galuszka refused, claiming that his wife's pregnancy made the move impossible. He stated, however, that he would accept the Syracuse transfer. Moffett then terminated his services for refusing to accept the new assignment.

The evidence showed that the supervisory staff personnel in the Boston Region were supporters of and a part of the CFB slate and it was they who persuaded Moffett to hold up Galuszka's transfer to Syracuse. Thus it would appear that politics were again a prime consideration. However, Moffett's undisputed testimony was that the Boston area had operated at a deficit and for reasons of economy the decision could be justified. Galuszka was the last staff appointee in the area and transfer was a logical choice. Meanwhile, the Syracuse slot had been filled and a vacancy had arisen in Lexington, Kentucky. Thus, Moffett's testimony in support of these decisions was plausible and reasonable.

### Frank Crise

Plaintiffs contend that Crise's authority as Regional Director was infringed upon and otherwise threatened because of his support of the opposition slate. The justification for this charge is supported by the record.

Frank Crise, a supporter of the CFB slate and member of District 50 for more than 25 years, was a Director of the St. Louis, Missouri Region. During his membership he had served as Regional Director in at least five other regions.

He charged that on two occasions Moffett transferred staff personnel in and out of his Region, without prior consultation, all contrary to established practice. Both transfers took place on November 26, 1969. The first involved the Sizemore transfer, found to be unwarranted. The second was the transfer of Assistant Regional Director, Charles Duty (a Moffett supporter), from Birmingham, Alabama to the St. Louis Region, to replace Sizemore.

Crise further testified in support of his charges that Moffett suggested to him that in return for Crise's political support, Moffett would consider transferring him to Salt Lake City where it was known he desired to retire. Crise also testified that Moffett had sent one Ford, an International Officer favorable to his slate into Crise's Region to actively advance Moffett's candidacy and that Union funds had been used to defray Ford's expenses.

A review of the testimony covering the transfer of personnel to and from Crise's region leaves the Court to conclude that it was an attempt to dilute the impact of the CFB slate in the St. Louis Region. While Moffett attempted to justify the decisions and claimed that he was empowered to do so under the Constitution, the Court is not convinced by his explanation. The Court further believes Crise's testimony namely, that Moffett had proposed a transfer to Salt Lake City in return for his support.

It was also undisputed that when Ford visited St. Louis, which was an authorized trip, he campaigned for Moffett and was otherwise quite overt in the advocacy of his re-election. Ford was an

important person in the Union and his presence in St. Louis under such circumstances was undoubtedly to convey the thought to Crise that support of the Moffett slate was expected of him.

The Court does, therefore, find that the preponderance of the evidence supports plaintiffs' contention that the above actions infringed upon Crise's prerogative as Regional Director,[2] intimidated him in the exercise of his right to support candidates of his choice and to express his views, and otherwise carried implied threats of reprisal for failure to act in accord with Moffett's desires.

The Constitution of District 50 grants authority to the President to suspend or remove personnel for insubordination or just cause; to appoint, at his discretion, field and office workers, and to otherwise exercise general supervision over the field and office affairs. (Article VII, Sections 2, 3, and 4).

Prior to 1959, union members who voiced opposition to the improper exercise of such power might have exposed themselves to the risk of demotion, suspension or dismissal, frequently without effective redress. Today, however, the exercise of power by union officials must be consistent with the LMRDA's "Bill of Rights" and the policy considerations underlying those provisions. [3]

The language of that Section and the interpretation given by the Courts leave little doubt that the actions taken by Moffett against De Falco, Gentile, Sizemore and Crise were well within the protective ambit of LMRDA.[4] The increasing number of decisions dealing with equal rights, freedom of speech and assembly, and the disciplining of a member seeking participation in the Union's

democratic processes, have followed an ever-widening interpretation. Such rulings have been made in this as well as in other jurisdictions. Grand Lodge of Internat'l Ass'n of Machinists v. King, 335 F.2d 340 (9th Cir. 1964) cert. denied, 379 U.S. 920, 85 S.Ct. 274, 13 L.Ed.2d 334 (1964); Salzhandler v. Caputo, 316 F.2d 445 (2d Cir. 1963); Retail Clerks Union, Local 648 v. Retail Clerks Int. Ass'n, 299 F.Supp. 1012 (D.D.C. 1969); DeCampli v. Greeley et al., 293 F.Supp. 746 (D.N.J. 1968); Alvino v. Bakery Workers Union, 46 L.R.R.M. 2812 (D.D. C. 1960).

██ Defendants assert that the plaintiffs were required to exhaust the internal remedies available under the Constitution before filing this proceeding. They argue that an appeal should have been undertaken first to the International Executive Board of District 50 and that Section 101(a) (4) of the Act specifically requires exhaustion of union hearing procedures.

While the exhaustion of internal union hearing procedures is normally required in order that the effectiveness and integrity of those procedures might be protected, a failure to exhaust them does not invariably foreclose judicial review of alleged grievances. A Union member seeking vindication of his Title I rights need not exhaust internal procedures where he might be prejudiced by the delay involved, where the Union's appellate body might be biased, or where the internal procedures might themselves be inadequate. Fulton Lodge No. 2 of the International Ass'n of Machinists, etc. v. Nix, 415 F.2d 212 (5th Cir. 1969); Detroy v. American Guild of Variety Artists, 286 F.2d 75 (2d Cir.

---

2. See Navarro v. Gannon, 385 F.2d 512 (2nd Cir. 1967); cert. denied, 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968).

3. 29 U.S.C. § 411(a) (1) (2).

4. Although Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964), reh. denied 379 U.S. 984, 85 S.Ct. 639, 13 L.Ed.2d 577 (1965), urged by

defendants, does imply that pre-election remedies are to be applied with considerable restraint, Title IV remedies are aimed at insuring a democratic election and would not restore the positions, rights, or reputations to which the plaintiffs are entitled. On the other hand, to grant pre-election relief would in no way delay or further complicate the election.

1961); Sheridan v. Liquor Salesmen's Union, Local 2, 303 F.Supp. 999 (S.D.N.Y.1969); Tirino v. Local 164, Bartenders and Hotel & Restaurant Employees Union, 282 F.Supp. 809 (E.D.N.Y.1968). See also N.L.R.B. v. Industrial Union of Marine and Shipbuilding Workers, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968). Even the majority of those cases urged by the defendant support such a reasonable approach. Baron v. North Jersey Newspaper Guild, Local 173, 342 F.2d 423 (3rd Cir. 1965); Harris v. International Longshoremen's Ass'n, Local 1291, 321 F.2d 801 (3rd Cir. 1963). In this proceeding, the plaintiffs' failure to exhaust internal remedies, inadequate as they are, is excusable because of the continuing difficulties between the parties, the domination by Moffett of the Executive Board, and the irreparable harm that delay may cause in view of the approaching election.

## II

The remaining allegations in the complaint relate to Moffett's alleged breach of his fiduciary duty by his "gerrymandering" of regions and his diversion of Union funds, both for purposes of his political campaign. The Court concludes that the facts do not justify findings for the plaintiffs on either of these issues, consequently it is unnecessary to consider the question of what power this Court has to correct the alleged "gerrymandering" or to rectify Moffett's alleged diversion of Union funds and personnel to promote his candidacy.

### "Gerrymandering" Of The Regional Office

On two occasions subsequent to the announcement of the plaintiffs' slate, Moffett created two District Regions out of what had been one, and in the newly established Regions appointed Directors who were allegedly favorable to his candidacy. In one instance Region 37 (Ludington, Michigan), was created from part of Region 63 (Saginaw, Michigan) and in a later instance, Region 25 (Providence, Rhode Island) out of Region 1 (Boston, Massachusetts).

The President's authority to make such decisions appears consistent with the provision of the Union's Constitution authorizing him to define areas of field operations and regions as necessary to conduct the affairs of the Union and to exercise general supervision over the field and office workers. (Article VII, Sections 4 and 11).

The plaintiffs label this as "gerrymandering," designed to dilute the influence of their slate in Regions where they had considerable support. The evidence showed, however, that these newly created Regions had actually existed before, and that it was not uncommon for the geographical boundaries of a Region to be changed from time to time on grounds of economy, efficiency of operation, or as otherwise warranted by the demands of changing circumstances. While plaintiffs may claim that this was an assertion of raw power by Moffett the evidence falls far short of such proof. Moreover, the reasons given by Moffett to support his decision were reasonable and sound. This, together with his testimony relating to the history of prior changes undertaken by him, similar in nature in the same and other Regions, compels a finding that there was not here a calculated design to lessen the impact of the plaintiffs' slate. It is understandable that political motives were attributed to Moffett but the Court finds that his decisions were fully justified and supported by substantial evidence.

### Improper Use Of Union Funds

Among their claim for damages, plaintiffs refer to trips of various Union officials, which they assert were arranged and authorized by Moffett to impede the progress of their slate or to promote the candidacy of Moffett.

The testimony covered three allegations: First, that the plaintiff, Crise, was ordered to Washington for several days by Moffett specifically to keep

Crise away from his Region while certain locals were making nominations for candidates in the May election. Secondly, that a trip to the Newark, New Jersey Regional Office by Oshinski, an Assistant to Moffett, was solely to promote Moffett's candidacy and was an improper use of Union funds. And thirdly, that Ford, an Assistant to Moffett was improperly assigned to the St. Louis, Missouri Regional Office for a similar purpose.

The evidence does not support any of these allegations. While the testimony that Crise was in Washington for two days and conferred with Moffett for only one hour was not successfully contradicted, there was no credible testimony to support the conclusion that this was a maneuver designed by Moffett. Nor was there credible testimony that even if Crise had been present in his Region he could have attended all of the local meetings or that the voting at the locals was influenced in any way by his absence.

None of the testimony concerning the Oshinski visit to the Newark, New Jersey Office warrants a finding that it was for other than legitimate Union purposes. Even though the testimony shows that when Ford was in the St. Louis Region, he actively solicited support for Moffett's candidacy, the evidence also shows that the local supporters of the CFB slate did likewise. A consideration of the entire testimony fails to disclose any substance to the allegation that Ford's trip was designed primarily to promote Moffett's political candidacy.

Further issues to be determined are whether the specific personnel actions of Moffett affecting the plaintiffs De Falco, Gentile, Sizemore and Crise were accompanied by an improper use of Union funds and a resulting breach of Moffett's fiduciary duty to the Union and to the plaintiffs. 29 U.S.C. § 501(a), (b). John J. Badoud, a plaintiff and the Union's Secretary-Treasurer, testified as to certain expenses incurred by these plaintiffs, all paid by the Union, and allegedly stemming from Moffett's actions. His testimony was fragmentary and inconclusive and the Court is not convinced that the amounts claimed may be attributed substantially to Moffett's improper action. The Court denies the claim and it is, therefore, unnecessary to consider the exhaustion of remedies requirement of § 501. The Court, likewise, finds no basis for granting the plaintiffs either compensatory or punitive damages.

■ Since the personnel actions taken against De Falco, Gentile and Sizemore, and the interference with Crise were substantially political reprisals designed to undermine the rights of those plaintiffs, the CFB slate, and its supporters, the Court will order that the demotions of De Falco and Gentile, and the transfer of Sizemore be set aside with reinstatement of any accompaning rights and benefits they might have lost. Further, the Court will order that the defendants cease and refrain from threatening or actually interfering with, coercing or penalizing, in any manner, the rights of De Falco, Gentile, Sizemore, Crise, the CFB slate, or any of its supporters.

Both as appropriate statutory relief to the plaintiffs, and because of the indirect benefit to the Union and its members as a whole, the Court will award counsel fees to the plaintiffs, the amount to be determined in subsequent proceedings.

This Memorandum Opinion shall constitute the findings of fact and conclusions of law. Counsel will prepare an appropriate order within five days.