**Ann R. FORMAN, Administratrix of the Estate of Brian Forman, Plaintiff,**

v.

**MOUNT SINAI MEDICAL CENTER a/k/a Mount Sinai Hospital, Defendant.**

**No. 86 CV 1213 (KMW).**

United States District Court, S.D. New York.

Nov. 20, 1989.

## OPINION

KIMBA M. WOOD, District Judge.

Plaintiff moves pursuant to 28 U.S.C. § 1927 to assess against counsel for defendant all reasonable costs, including attorney's fees, incurred by plaintiff in effectuating settlement as a result of defense counsel's vexatious and unreasonable conduct, and for interest on the settlement amount from August 28, 1989 to October 2, 1989, pursuant to the inherent authority of the Court. Defendant cross-moves pursuant to § 1927 for costs and attorney's fees. For the reasons set forth below, plaintiff's motion is granted and defendant's motion is denied.

### FACTS

*A. Trial* [1]

The case was tried to a jury by Thomas P. Mains, Jr., of Mains & Nichols, for plaintiff, and Jeffrey S. Wolk, of Bower & Gardner, for defendant. Mr. Wolk was assisted by Philip A. Di Pippo, an associate at Bower & Gardner. Because Mr. Di Pippo had failed to comply with the Court's instructions and deadlines for filing pretrial materials, there were delays during trial to resolve legal and evidentiary issues that could have been resolved pretrial. *See e.g.,* Trial Transcript ("Trial Tr.") at 1700–1704, 1711–1714, 1720–1723, 1914–1915. During the trial, the Court saw Mr. Wolk signalling a witness three times, and reprimanded him each time. Trial Tr. at 1636–1639, 2301, and 2320–2323. Mr. Wolk also ignored several rulings on the scope of examination, frequently immediately following the ruling. Trial Tr. 189–191, 750–753, 1230, and 1936–1937.

Thomas P. Mains, Jr., Mains & Nichols, Alexandria, Va., for plaintiff.

Jeffrey S. Wolk, Philip A. Di Pippo, Bower & Gardner, New York City, for defendant.

*B. Settlement Negotiations, July 27 to September 6* [2]

Periodically throughout the trial, the Court, with the consent of counsel, participated in settlement negotiations between

1. Plaintiff's motion and defendant's cross-motion relate only to events that occurred after trial. Certain acts by defense counsel pretrial and during trial could have been the subject of sanctions, but the Court chose not to sanction defense counsel for those acts. Examples are provided here only for background.

2. All dates refer to 1989.

counsel. On July 27, after a total of fifteen trial days and just prior to the conclusion of the last witness' testimony, counsel for plaintiff and defendant agreed on a settlement in the presence of the Court. The terms of the settlement were simply that defendant would pay plaintiff a sum of money in return for a full release by plaintiff. Both parties also at that time acknowledged in the Court's presence that plaintiff intended to continue her action against Dr. L. Harrison Pillsbury, a doctor in Washington, D.C. unaffiliated with Mt. Sinai, and that the doctors from Mt. Sinai did not intend to testify in that action. No other terms were discussed or included.

As in most settlements, the effectuation of settlement required an order of dismissal, which was signed by counsel and "So Ordered" by the Court in the presence of counsel on July 27. In addition, because this was a wrongful death claim, the settlement had to be approved (in the form of a Compromise Order) by a court having jurisdiction over the decedent's estate (in this case, any Virginia court of general jurisdiction). Both counsel told the Court that the settlement could be effectuated in thirty days; the Court then entered an Order of Dismissal that permitted the case to be reopened if the settlement was not effectuated within thirty days.

On July 28, Mr. Di Pippo telefaxed a proposed release to Mr. Mains. On August 14,[3] Mr. Mains telefaxed a draft of the Petition and Compromise Order to Mr. Wolk for Mr. Wolk's endorsement; Mr. Mains also informed Mr. Wolk that he had obtained a Virginia court date of August 23, and that he planned to present the documents to the Virginia Court at that time. Shortly after receiving the proposed settlement documents from Mr. Mains, Mr. Wolk advised Mr. Mains' secretary by telephone that there would be a substantial delay in approving the settlement documents and that, in any event, no settlement would be effectuated unless and until deposition fees for defendant's expert witnesses, Drs. Ilowite and Edelson, were paid.[4] Mr. Mains responded to Mr. Wolk's telephone call by telefax on August 21. He stated that the payment of deposition expenses was not part of the settlement:

> [b]y no means was our settlement contingent or dependent in any way upon those matters. If we have a dispute about that, I am quite sure the Court will be happy to indicate whether or not my client is obliged to be responsible for such charges.

In addition, Mr. Mains advised Mr. Wolk that he had checked his records, that he believed Dr. Ilowite's bill to be excessive, and that he had never received a bill for Dr. Edelson's services. Mr. Mains also stated that he had sent Mr. Di Pippo a letter to that effect on February 27 but had received no response. Mr. Mains further said that he did not understand the reason

---

**3.** At the time of settlement, Mr. Mains informed both the Court and opposing counsel that he was leaving for a long-planned, one-week vacation on July 28, the following day. The 30–day period was selected with the understanding that Mr. Mains would begin work on the settlement papers on his return.

**4.** Apparently, counsel had agreed during discovery that the party deposing an expert would pay that expert's fee for the deposition.

Mr. Wolk reiterated the substance of the telephone conversation by letter to Mr. Mains, dated August 21, in which he stated in addition that "as part of the settlement order referable to the distribution of the settlement proceeds, it will be necessary to include these amounts which are due and owing to Drs. Paul Edelson and Norman Ilowite."

Mr. Wolk's August 21 letter also demanded that new release language be included in the Compromise Order:

> [defendant] would require that the Compromise Order provide for a termination and release of any and all claims whether presently known or unknown as against Mt. Sinai Medical Center, ... *and all other tort feasors,* whether presently known or unknown, *liable or claimed to be liable jointly with the Mt. Sinai Medical Center* who are insured by and/or *owed any obligation of indemnity* by the Mt. Sinai Medical Center,.... (Emphasis added.)

This demand was surprising because Mr. Di Pippo had already sent a proposed release to Mr. Mains that did not contain this language, and, furthermore, it did not appear to be necessary to include a second release in the Compromise Order. In addition, the added release language could be claimed by Dr. Pillsbury to release plaintiff's claims against Dr. Pillsbury, a result contrary to the July 27 settlement agreement.

for the delay in approving the settlement documents. Mr. Wolk replied by letter dated August 23, but he did not address the delay in endorsing the settlement documents. Moreover, he did not clarify the amount of Dr. Ilowite's bill and did not enclose a bill for Dr. Edelson's services.

On August 29, Mr. Mains responded to Mr. Wolk's August 21 follow-up letter, outlining in detail the function of the Virginia court documents (the Petition and Compromise Order). Mr. Mains explained that the addition of a release to the Compromise Order would be duplicative and unnecessary. Mr. Mains further stated that his client was prepared to execute the release previously sent by Mr. Di Pippo, and again requested that Mr. Wolk endorse the Compromise Order as a first step in effectuating settlement. Mr. Mains also stated that it would be inappropriate to include a provision for the payment of expert fees in the Compromise Order. He explained that the Compromise Order contained a list of disbursements for the sole purpose of authorizing payment; the Compromise Order was not intended as a device to resolve outstanding disputes between the parties. Defense counsel did not respond to Mr. Mains' August 29 letter.

### C. Settlement Negotiations, September 6 to September 22

On September 6, Mr. Mains contacted the Court and requested a telephone conference because settlement had not been effectuated. The history of the case was rife with allegations of bad faith between counsel, who found it difficult to communicate with one another, and the Court agreed to Mr. Mains' request in the hope that Court involvement might facilitate the discussions between counsel. The Court held a telephone conference that day with Mr. Mains and Mr. Wolk. The Court asked Mr. Wolk what obstacles there were to settlement; Mr. Wolk replied that the *only thing* holding up settlement was the non-payment of expert fees. Although Mr. Wolk did not inform the Court of any additional obstacles to settlement at the September 6 telephone conference, defense counsel later claimed at various times that settlement could not be effectuated because (1) the Virginia Compromise Order did not reflect the payment to defendant's experts, (2) the Compromise Order did not contain certain release language required by defendant,[5] (3) the Compromise Order could not be endorsed until plaintiff executed a separate release that included a broader release than the release previously proposed by defendant's own lawyer, Mr. Di Pippo, (4) there would be a substantial delay in obtaining a check because a European carrier was involved, (5) language in the Virginia Petition indicating that the settlement amount would be "payable immediately" would have to be changed, and (6) defendant would not issue a check to plaintiff for the entire settlement amount, but would only issue individual checks according to the disbursement list in the Compromise Order.[6]

Because Mr. Wolk did not know the exact amount due for expert fees, the Court scheduled a second telephone conference, with Mr. Mains and Mr. Di Pippo to be on the line. The Court's clerk informed both Mr. Mains and Mr. Di Pippo by telephone on September 11 that the telephone conference would take place on September 12, at 5:30 p.m.[7] When the Court's clerk attempt-

---

5. At the September 22 hearing, the Court asked Mr. Wolk why he had not raised at the September 6 telephone conference the fact that he wanted a broader release than that contained in the release he previously sent to Mr. Mains. Mr. Wolk replied "I was unaware at that point in time that there was a problem with this." Transcript, September 22, 1989 ("9/22 Tr.") at 39–40. However, on September 28 Mr. Wolk wrote to the Court setting forth a sequence of events that belies his September 22 statement to the Court. In his letter, he states that the September 6 telephone conference followed a conversation that same day between Mr. Wolk and

Mr. Mains in which Mr. Mains objected to the broader release language, and in which Mr. Mains indicated that he intended to have his client execute the previous version of the release sent by Mr. Di Pippo on July 28. September 28, 1989 Letter from Mr. Wolk to Judge Wood, at 2.

6. Mr. Wolk raised these last two issues with the Court's clerk during a recess at the September 22 conference.

7. The telephone conference was originally scheduled for September 11, but was postponed due to the Court's schedule.

ed to set up the conference call, Mr. Di Pippo was not in his office. Mr. Mains eventually located Mr. Di Pippo at 5:50 p.m.; Mr. Di Pippo gave no explanation for his delay. The Court resolved the issue of the payment of the expert fees, directing plaintiff to pay a total of $2300 for expert services.[8] Mr. Di Pippo did not mention any additional obstacle to settlement.

The Court held a third telephone conference on September 13.[9] Mr. Di Pippo continued to assert the non-payment of expert fees as a reason for failing to endorse the Compromise Order, despite the Court's prior resolution of that issue.[10] In an attempt to hasten the settlement process, the Court directed Mr. Di Pippo to deduct the amount due the experts from the settlement check. Mr. Di Pippo then indicated that the Compromise Order would have to be retyped to reflect the deduction. The Court explained to Mr. Di Pippo that because the amount of the settlement remained the same, despite the deduction of money from the check, the Compromise Order was accurate and did not need to be rewritten. Mr. Di Pippo did not mention any additional obstacle to settlement. The Court then ordered Mr. Di Pippo either to have the Compromise Order endorsed and delivered to Mr. Mains within two days, or to report to the Court in two days by telephone with Mr. Mains on the line. Mr. Di Pippo did neither.

Because Mr. Di Pippo failed to comply with the Court's September 13 Order to telephone the Court in the event he did not deliver to Mains an endorsed Compromise Order, the Court scheduled a fourth telephone conference for September 19 at 4:00 p.m. The time for the conference was selected by Mr. Di Pippo, in a telephone conversation with the Court's clerk on September 18.[11] Again, Mr. Di Pippo was not in

---

**8.** At the September 12 telephone conference, Mr. Mains stated that Dr. Ilowite's deposition took no more than two or three hours, but that he had received a bill for five hours at $250 per hour. Mr. Di Pippo explained to Mr. Mains for the first time that the additional two hours represented travel time. Had defense counsel responded to Mr. Mains' February 27 letter or to the substance of his August 21 letter, the dispute could have been resolved long ago, very likely with little or no intervention from the Court. In addition, the Court notes that defense counsel have provided no documentation indicating that a bill for Dr. Edelson's services was sent to Mr. Mains prior to September 11, when Mr. Mains indicates that he was first informed of the amount of the bill by a telefax from Mr. Di Pippo of a redacted copy of Dr. Edelson's bill to Bower & Gardner. October 5, 1989 Letter from Mr. Mains to Judge Wood, at 4.

**9.** The Court initiated the telephone conference after Mr. Di Pippo informed the Court's clerk that he had received a telefax from Mr. Mains rescinding the settlement on the ground of non-performance. This telefax was apparently sent at the direction of the plaintiff, Ann Forman.

When the Court's law clerk telephoned Mr. Wolk on September 13 and informed him that the Court wanted to have a telephone conference with him and Mr. Mains, Mr. Wolk responded that he would not talk to Mr. Mains or get on the telephone with him. Instead, Mr. Wolk located Mr. Di Pippo to participate in the telephone conference.

At the conference, the Court directed Mr. Mains to advise Mrs. Forman that the Court would not permit the agreement to be rescind-

ed. The Court notes that plaintiff's attempt to rescind the settlement agreement was not unreasonable, given defense counsel's dilatory conduct. However, in light of the strong public policy favoring enforcement of settlement agreements reached after consuming substantial trial time before a jury, and in light of the Court's belief that enforcement of the agreement could be accomplished promptly with sufficient facilitation of communication by the Court, and for the reasons stated at the September 22 conference, the Court denied plaintiff's request to rescind the agreement. *See,* 9/22 Tr. at 2–5.

**10.** On page three of his September 28 letter, Mr. Wolk states that at the September 13 conference, "a discussion ensued regarding the outstanding expert fees even though the Court had already ordered these to be paid." It is necessary to clarify that it was Mr. Di Pippo who raised the issue of the expert fees at the September 13 conference, and that at no time did Mr. Mains indicate that he did not intend to comply with the Court's Order regarding the payment of expert fees. In fact, when asked at the September 13 conference whether he still had any quarrel with the amount of the expert bills, Mr. Mains replied with words to the effect that, "I don't see how I can, your Honor, in light of your Honor's ruling."

**11.** When the Court's law clerk called Mr. Di Pippo to select a time for the phone conference, Mr. Di Pippo responding by yelling that he was "sick of these phone conferences. You tell Judge Wood that I don't see the need for a phone conference."

his office at the scheduled time; he returned at 4:30 p.m.

At the September 19 telephone conference, Mr. Di Pippo represented to the Court that Mt. Sinai Hospital and the Federation of Jewish Philanthropies require that certain language pertaining to releases be included in the Compromise Order; he represented to the Court that because his client required such language, his firm had been unable to endorse the Compromise Order.[12] Mr. Di Pippo took the position that this requirement had been communicated to Mr. Mains in Mr. Wolk's August 21 letter, and that Mr. Mains had failed to comply:

> THE COURT: Mr. DiPippo, all I am really trying to find out is, do you have in your office an order of compromise that you can sign?
>
> MR. DI PIPPO: No, I don't. May I respond to Mr. Mains' fabrications, your Honor?
>
> MR. MAINS: Fabrications?
>
> THE COURT: Mr. DiPippo, you better be pretty careful how you speak here.
>
> MR. DI PIPPO: I am very accurate. I have in front of me a letter that Mr. Mains referred to of August 21, 1989. In that letter as Mr. Mains pointed out we objected to some specific language, and we—this is language that Mt. Sinai Hospital required and the Federation of Jewish Philanthropies requires in any of their compromise orders and any of their settlement orders; and the language has not been to date put into the compromise order, and therefore we do not have a compromise order in accordance with this letter, and I can read it into the record and I would like to read into the record the language that we asked back on August 21 to be included and which has not to date.

12. Mr. Di Pippo first raised this issue with the Court in a letter to the Court dated September 18, which the Court received approximately 45 minutes prior to the September 19 conference call. That letter also demanded a Stipulation of Discontinuance from plaintiff. However, on July 27, the date of the settlement, an Order of Dismissal and Order of Discontinuance was signed by both counsel and "So Ordered" by the Court in their presence. It was docketed on July 28, and was available in the public court files from that date.

> THE COURT: Why didn't you raise this at the last conference?
>
> MR. DI PIPPO: Because it was my understanding that Mr. Mains was to forward to us a compromise order.
>
> THE COURT: No, no, no, no, Mr. DiPippo. This is exactly why unfortunately this telephone conference and every subsequent one we have has to be on the record. You either purposely or through an inability to remember things mischaracterize what happens in almost every proceeding I have had with you.
>
> MR. DI PIPPO: That is not the case, your Honor.
>
> THE COURT: That is not really for you to judge at this point.
>
> MR. DI PIPPO: It is an accusation made against me, and I have to take you to task on that accusation.

Transcript, September 19, 1989 ("9/19 Tr.") at 3–4. Mr. Wolk took the same position at the September 22 hearing:

> MR. WOLK: It seems to me as though the Court has overlooked several documents—okay—that I'm sure your Honor is unaware of, and—
>
> THE COURT: I have overlooked documents that I am unaware of?
>
> MR. WOLK: Yes. And that may not have been brought to your attention.
>
> In fact, on the date Mr. Mains forwarded to me the proposed compromise order, I responded to him in a letter of August the 21st, 1989. At that time, I advised him as to what we would require in terms of the settlement.
>
> So as of August the 21st, the very terms and conditions which have been entered into here today, which the Court has approved here today, were made known to Mr. Mains by defense counsel.

\* \* \* \* \* \*

Mr. Di Pippo's September 18 letter further informed the Court that part of the settlement money would be coming from a European insurer, and that he had been "advised that it will take approximately ninety days to process this portion of the settlement," despite Mr. Wolk's representation to the Court at the time of settlement that settlement could be effectuated in thirty days.

MR. WOLK: I have my letter of August the 21st.

THE COURT: Okay. I want to make it a court exhibit. But go ahead.

MR. WOLK: It was after that that we received a September 12th letter indicating that ... this settlement was rescinded.

9/22 Tr. at 31–33. Neither Mr. Di Pippo nor Mr. Wolk informed the Court that Mr. Mains wrote back to Mr. Wolk on August 29, and explained why it would be inappropriate to include a complete release in a Virginia Order of Compromise.[13]

At the September 19 telephone conference, the Court asked Mr. Di Pippo, "why is it that Mount Sinai needs [the release language] in an order of compromise as opposed to in a separate document?" Mr. Di Pippo responded, "Your Honor, I don't have the answer to that. It's the client's policy." 9/19 Tr. at 6. The Court then asked Mr. Di Pippo for the name of the individual at the Federation empowered to approve the language of settlement documents:

> THE COURT: All right. Who is the Federation representative at your client who is empowered to settle cases? In other words, who is empowered to deal with such things as what language the order of compromise should contain?
>
> MR. DI PIPPO: I couldn't give you a specific name, your Honor. We receive memos from the Federation regarding clauses they require in releases. I don't understand what the problem here now is. I understood your Honor ordered Mr. Mains to pay.
>
> THE COURT: Mr. Di Pippo—
>
> MR. DI PIPPO: That hasn't been done.
>
> THE COURT: Mr. Di Pippo, you are repeatedly interrupting me. I will ask

you please to let me speak, and then I will give you a full opportunity to speak. .

> You tell me you don't know who at the Federation has this power. However, you have had either conversations or correspondence with someone from the Federation. With whom have you spoken or corresponded there with respect to what the order of compromise needs to say?
>
> MR. DI PIPPO: I would ask your Honor why she asks in a question [sic]. I have made a representation to you as an officer of the court. If you doubt my word—
>
> THE COURT: You may not. It is out of line for you to ask. You should simply answer the question.
>
> MR. DI PIPPO: Your Honor, you should give me a basis for the question. I am more than willing to give you a name, but I am curious as to why the court does not—so it appears—does not believe what I am telling you.
>
> THE COURT: I want you to give me the name now, and we will discuss where I am going with it as soon as you give me the name.
>
> MR. DI PIPPO: The woman that I have spoken with is named Kitty K I T T Y Srednicki S R E D N I C K I.

9/19 Tr. at 16–17. The Court then scheduled a conference for September 22, and, in order to bring into the discussion someone who could speak for the Federation's needs, the Court ordered Ms. Srednicki to appear at the conference.

At the September 22 conference, Mr. Wolk and Ms. Srednicki stated that no additional language was necessary in the Compromise Order, without offering any reason why Mr. Di Pippo took a contrary position with the Court earler. 9/22 Tr. at 6. Mr. Wolk then refused to accept the release that Mr. Di Pippo sent to Mr. Mains on July 28, insisting that his client required additional language.[14]

---

13. Mr. Wolk continued to rely on his August 21 letter, without mentioning or including Mr. Mains' August 29 letter, in Mr. Wolk's September 28 letter in opposition to the present motion.

14. Although Mr. Wolk's August 21 letter demanded additional release language, the letter

required only that the language be included in the Compromise Order, and did not indicate that the separate Release sent by Mr. Di Pippo was no longer acceptable. Until the September 22 hearing, both the Court and Mr. Mains believed that defense counsel was insisting on two releases (one in the Compromise Order with the language contained in the August 21 letter, and

The Court also asked Mr. Wolk when he first saw the Compromise Order. Mr. Wolk represented that he first received the document on August 21:

> MR. WOLK: August the 21st, I believe, just at about that time.
>
> THE COURT: Let me ask Mr. Mains when he believes he first sent you such a document?
>
> MR. MAINS: August 14th, your Honor.
>
> THE COURT: Please proceed.
>
> MR. WOLK: I have my letter of August the 21st.
>
> \* \* \* \* \* \*
>
> THE COURT: Well, you told me that—I mean, on August 14th, Mr. Mains says he first sent this document to you. And I think you just agreed with that.
>
> MR. WOLK: I didn't agree to that.
>
> THE COURT: So you certainly knew that. Well, you knew it in August.
>
> MR. WOLK: No, your Honor, I had the document by August 21st. I have a letter responding to Mr. Mains.

9/22 Tr. at 32–33, 39. However, Mr. Wolk's August 21 letter expressly states that Mr. Wolk received the Petition and Compromise Order "late in the afternoon of August 15, 1989." [15]

Furthermore, throughout the Court's efforts to effectuate settlement, both Mr. Wolk and Mr. Di Pippo repeatedly insisted to the Court that they could not endorse the Compromise Order until *Mr. Mains* sent them a new copy because they had returned the Petition and Compromise Order *to plaintiff's counsel* with Mr. Wolk's August 21 letter. However, Mr. Wolk's August 21 letter states, "I ... have forwarded the proposed documents [*i.e.*, the Petition and Compromise Order] to the client for their review and comment."

the other separately executed in the form sent by Mr. Di Pippo). Mr. Wolk stated for the first time on September 22 that his client would require that the additional language contained in the August 21 letter be added to the Release previously sent to Mr. Mains by Mr. Wolk's associate, Mr. Di Pippo. 9/22 Tr. at 7.

During the September 22 conference, the Court took a recess and directed counsel to attempt to work out the exact language of the release. Despite the Court's Order, Mr. Wolk

## DISCUSSION

### A. The Applicable Standards

Title 28, United States Code, Section 1927 provides:

> Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorney's fees reasonably incurred because of such conduct.

In *Oliveri v. Thompson*, the Second Circuit held that "[i]mposition of a sanction under § 1927 requires a 'clear showing of bad faith.'" 803 F.2d 1265, 1273 (2d Cir.1986), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987) (quoting *Kamen v. American Telephone & Telegraph Co.*, 791 F.2d 1006, 1010 (2d Cir.1986)). The finding necessary is "similar to that necessary to invoke the court's inherent power [cite omitted]." *Id.*

The Supreme Court has stated that to support an award of sanctions pursuant to the court's inherent power, the district court must find that an attorney's conduct "constituted or was tantamount to bad faith." *Roadway Express v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 2465, 65 L.Ed.2d 488 (1980). *See also, F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974) (a court can award attorney's fees under its inherent power when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons ..."); *Oliveri v. Thompson*, 803 F.2d at 1272 ("An inherent power award may be imposed either for commencing or continuing an action in bad faith, vexatiously, wantonly, or for oppressive reasons"). This language implies that a

would not speak to Mr. Mains, directing his comments instead to the Court's clerk who in turn communicated them to Mr. Mains. Mr. Mains then responded directly to Mr. Wolk.

15. During the recess at the September 22 conference, Mr. Wolk represented to the Court's clerk that Mr. Wolk had never seen the Petition before. However, Mr. Wolk states in his August 21 letter, "I have had an opportunity to review the Petition."

district judge need not apply a subjective standard of bad faith, but may find bad faith where an attorney engages in conduct that is so objectively unreasonable that he necessarily must have been acting in bad faith. *See also, Oliveri v. Thompson*, 803 F.2d at 1273 ("an award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay"); *Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir.1987) ("the proper standard under either Rule 38 or § 1927 is that excess costs, expenses, or attorney's fees are imposable against an attorney personally for conduct that, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court"). *But see, Burgos v. Murphy*, 692 F.Supp. 1571, 1577 (S.D.N.Y.1988) (sanctions under both § 1927 and the court's inherent power require a showing of subjective bad faith).[16]

The imposition of sanctions should be cautiously and carefully applied, to insure that § 1927 "in no way will dampen the legitimate zeal of an attorney in representing his client." H.R.Conf.Rep. No. 1234, 96th Cong., 2d Sess. 8, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2716, 2781, 2782, cited in *Braley v. Campbell*, 832 F.2d at 1512. However, the Court should not abdicate its responsibility to impose sanctions where an attorney "has demonstrated a blatant disregard of the rules and regulations which permit the judicial machinery to function smoothly. An obligation is imposed on this Court to exercise its disciplinary powers to deter such conduct in the future." *Warner Brothers Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1128 (2d Cir.1989), citing 28 U.S.C. §§ 1912, 1927 and Fed.R.App.P. 38. In addition, the risk that the imposition of sanctions will have a

chilling effect on an attorney's zealous representation of his client is at a minimum when the misconduct occurs not even in the context of settlement negotiations, but in the context of effectuating a previously agreed-upon settlement. In this context, the courts should be able to expect counsel to work together reasonably to accomplish what they have agreed in the presence of the Court to do.

### B. Findings of Defense Counsel's Bad Faith

■ 1. *Defense counsel in bad faith failed to communicate reasonably with plaintiff's counsel regarding the wording of the settlement documents and the payment of the experts, delaying the settlement and necessitating the Court's involvement in matters that could easily have been resolved between counsel.* It is abundantly clear from the correspondence submitted by the parties that defense counsel did not respond in any meaningful manner to Mr. Mains' efforts to effectuate settlement. Mr. Wolk failed to respond to the substance of Mr. Mains' August 21 letter, and failed to respond at all to Mr. Mains' August 29 letter. Indeed, it appears that the only substantive responses of any kind that Mr. Mains obtained from defense counsel occurred in the presence of the Court. The Court cannot conceive of a good faith basis (and defense counsel asserts none) for failing to respond to plaintiff's counsel's letters, or to the issues raised therein, especially in the context of effectuating a previously agreed upon settlement. That defense counsel proceeded in bad faith in their communications with Mr. Mains is further evidenced by the fact that Mr. Wolk twice refused to speak to Mr. Mains even *at the request or direction of the Court*.[17] In addition, Mr. Mains has

---

**16.** In addition, it is well settled that sanctionable conduct may occur at any time in the litigation. " '[B]ad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Hall v. Cole*, 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973); *Lipsig v. National Student Marketing Corp.*, 214 U.S.App.D.C. 1, 663 F.2d 178, 182 (1980) (sustaining an award of attorney's fees for dilatory tactics during the litigation and

"general obstinacy unconnected with the merits of the case"). *See also, Apex Oil Co. v. Belcher Co. of New York, Inc*, 855 F.2d 1009, 1020 (2d Cir.1988) ("[t]he failure to confer in good faith over discovery disputes in violation of a local rule clearly 'multiplies the proceedings ... unreasonably and vexatiously,' and Section 1927 thus provides ample authority for sanctions").

**17.** *See,* fns. 9, 14, *supra.*

had difficulty obtaining substantive responses from defense counsel throughout this litigation.[18]

*2. Defense counsel in bad faith failed to communicate reasonably with the Court regarding the effectuation of settlement.*

Defense counsel's interactions with this Court have been characterized by a persistent withholding of information, refusing to concede verifiable facts, failing to obey Court orders, failing to be on time for telephone conferences, and misrepresenting or mischaracterizing facts to the Court, thereby multiplying the number of conferences needed and wasting time at the conferences held.

First, defense counsel failed to identify all the obstacles to settlement when asked by the Court, proceeding instead on a piece-meal basis, first identifying one obstacle as the "only" obstacle, then identifying new obstacles in later telephone conferences. Each of these obstacles was known or should have been known to defense counsel before the September 6 telephone conference with the Court. Defense counsel have provided no good faith basis for failing to inform the Court immediately of all obstacles to settlement. Mr. Wolk's September 28 letter demonstrates either that Mr. Wolk knew that Mr. Mains objected to the broader release language required by defendant and Mr. Wolk chose to withhold that information from the Court, or that Mr. Wolk did not in good faith believe that his client required the broader release language he was demanding. The Court finds that Mr. Wolk's failure to raise the issue of the language of the settlement documents at the September 6 telephone conference, and Mr. Di Pippo's failure to raise any of the issues mentioned in his September 18 letter at the September 12 and 13 telephone conferences, was unreasonably dilatory and constituted bad faith.

Second, the Court finds that defense counsel deliberately misled the Court by obstinately relying on Mr. Wolk's August 21 letter as an excuse for their refusal to endorse the Compromise Order, while withholding from the Court the crucial fact that Mr. Mains communicated his objections to the August 21 letter, and that defense counsel failed to respond. Although defense counsel's statements to the Court regarding the August 21 letter were literally true, their failure to advise the Court of the critical point that defense counsel had received a *response* to the August 21 letter and had themselves failed to reply is an omission so glaring that the Court finds that it must have been the product of bad faith, and a willful attempt to mislead the Court.

Third, Mr. Di Pippo failed to obey Court orders, with no explanation whatsoever, no less a good faith basis for the failure. Mr. Di Pippo failed to be on time for each telephone conference previously scheduled with the Court.[19] Mr. Di Pippo also initially refused to answer a direct question from the Court, instead *demanding* that the Court give Mr. Di Pippo a basis for the question. 9/19 Tr. at 16–17. In addition, Mr. Di Pippo failed to comply with the Court's September 13 Order. The only "explanation" ever given for Mr. Di Pippo's failure in this regard is no explanation at all; it is contained on page 10 of Mr. Wolk's September 28 letter to the Court:

> [i]t is the Court's recollection (as was indicated during the September 22, 1989 Court conference) that Mr. Di Pippo was

---

**18.** *See, e.g.,* February 3, 1989 Letter from Mr. Mains to Judge Wood; June 20, 1989 Letter from Mr. Mains to Judge Wood. Although the Court's findings are adequately supported by the Court's own observations and experience with defense counsel, the Court also credits plaintiff's counsel's version of his attempts at effectuating settlement and defense counsel's responses or lack thereof. This assessment of Mr. Mains' credibility is based on the Court's observations of and interaction with Mr. Mains throughout this litigation. Mr. Mains' representations to the Court have consistently been proven to be

accurate, and he has demonstrated to this Court that he is an attorney of candor, honesty and integrity. By contrast, Mr. Wolk and Mr. Di Pippo have little credibility with this Court. Throughout this litigation, they have been at times less than forthcoming, and occasionally untruthful.

**19.** Mr. Di Pippo was late for both the September 12 and the September 19 telephone conferences; the September 13 telephone conference was not previously scheduled.

to "have the Order approving compromise endorsed, and to deliver it to Mr. Mains within two (2) days, or report to the Court in two (2) days" *but apparently for some unknown reason this was not accomplished.* (Emphasis added.) The Court finds that Mr. Di Pippo's cavalier and consistent disrespect for the Court's orders unnecessarily delayed settlement, and manifests an intentional disregard of his duties as an attorney.

Finally, throughout this litigation, defense counsel have repeatedly misrepresented to this Court minor facts that were known to defense counsel and verifiable within their office.[20] This persistent pattern of misrepresentations and mischaracterizations of events within defense counsel's personal knowledge, as well as defense counsel's obstreperous and contumacious behavior with the Court, demonstrate defense counsel's intentional disregard of an attorney's duties to the Court, and can admit of no other interpretation than that defense counsel acted in bad faith in their communications to the Court regarding settlement.

■ *3. Defense counsel in bad faith used the nonpayment of expert fees to delay effectuation of settlement.*

The payment of deposition expenses was not part of the settlement agreement. *See,* 9/22 Tr. at 3–4. Defense counsel has put forth no good faith basis for believing that it was part of the agreement, and it is the Court's view that no good faith basis existed. Defense counsel's bad faith in this regard is further evidenced by the fact that if defense counsel in good faith simply wanted the expert bills paid, the obvious first step in accomplishing that goal would

have been to respond to Mr. Mains' request for an explanation of the number of hours in Dr. Ilowite's bill, and to respond to Mr. Mains' statement that he had not received a copy of Dr. Edelson's bill by sending Mr. Mains a copy of the bill. Defense counsel failed to do either until Mr. Mains sought and obtained the Court's intervention. In addition, as suggested to Mr. Wolk by Mr. Mains in his August 21 letter, the appropriate response from defense counsel to this discovery dispute would have been to request a ruling from the Court, which defense counsel failed to do. Instead, defense counsel unilaterally attempted to impose a new condition on settlement. Defense counsel's bad faith in using the payment of expert fees to delay effectuation of settlement is further evidenced by defense counsel's failure to expeditiously attempt to effectuate settlement once the issue of expert fees was resolved.[21]

*4. Defense counsel's failure to be adequately prepared was so unreasonable as to require a finding of bad faith.*

Defense counsel's failures to be adequately prepared to effectuate settlement wasted not only plaintiff's counsel's time and effort but the Court's as well. Mr. Di Pippo sent Mr. Mains a proposed release on July 28, apparently without first determining whether that release would be acceptable to his client, and defense counsel eight weeks later claimed that the release was unacceptable. Mr. Di Pippo also demanded a Stipulation of Discontinuance from plaintiff almost two months after such a Stipulation had been signed and docketed. In addition, Mr. Di Pippo repeatedly insisted that Mt. Sinai Hospital and the Federation

---

**20.** The Court did not attempt to make an exhaustive list of every misrepresentation or mischaracterization made by defense counsel in the course of the Court's efforts to effectuate settlement, or in defense counsel's submissions regarding the present motions. *See e.g.,* fn. 5, *supra;* fn. 15, *supra;* page 599, *supra;* page 605, *infra.*

**21.** On page nine of his September 28 letter, Mr. Wolk argues that it was Mr. Mains, not defense counsel, who used the issue of expert fees to avoid effectuating settlement, and that in any event the fees owed to expert witnesses became part of the settlement when the Court ordered

that the $2300 in fees be deducted from the settlement check. These assertions are simply contrary to fact. In his August 21 letter, Mr. Mains explicitly advised Mr. Wolk that he considered the issue of payment of expert fees to be separate and distinct from the issue of settlement. In addition, Mr. Wolk, not Mr. Mains, indicated to the Court that the payment of expert fees was holding up settlement. Moreover, the Court ruled on the expert fees pursuant to Fed.R.Civ.P. 26(b)(4)(C); the payment of expert fees did not become a condition of settlement simply because the Court, for the convenience of the parties, directed the defendant to deduct the fees from the settlement amount.

of Jewish Philanthropies require that certain language pertaining to releases be included in the Compromise Order, when in fact no such language was necessary. 9/22 Tr. at 6. Mr. Wolk further consumed both the Court's time and Mr. Mains' time with unnecessary disputes regarding the length of time his client would need to obtain a check.

■ On the basis of the above findings of bad faith, the Court finds pursuant to 28 U.S.C. § 1927 that defense counsel unreasonably and vexatiously multiplied proceedings. The Court further finds that absent defense counsel's unreasonable, vexatious and bad faith conduct, plaintiff would likely have been paid by August 28, 1989, thirty days after the July 27 settlement date. This finding is based on Mr. Wolk's representation to the Court at the time of settlement that settlement could be effectuated within thirty days, on the fact that Mr. Mains had obtained an August 23 court date from the Virginia court, and on the Court's assessment of the remaining tasks involved in effectuating settlement. Therefore, pursuant to the inherent authority of the Court, the Court is directing defense counsel to pay plaintiff interest on the settlement amount from August 28, 1989 until the date the settlement checks were actually received by plaintiff's counsel, October 2, 1989. *See, Mathewson Corp. v. Allied Marine Industries, Inc.*, 827 F.2d 850, 857 (1st Cir.1987).

## C. Additional Arguments Raised by Defense Counsel

In his September 28 letter, Mr. Wolk makes several additional arguments in opposition to plaintiff's motion for sanctions.

■ First, Mr. Wolk appears to argue on page nine that the fact that a variation on the indemnity language requested in Mr. Wolk's August 21 letter was ultimately incorporated in the release executed by plaintiff precludes a finding of bad faith on the part of defense counsel.[22] However, whether the language was incorporated into the release is irrelevant for purposes of considering sanctions under § 1927. *See, Roadway Express v. Piper*, 447 U.S. at 762, 100 S.Ct. at 2462 ("[Section] 1927 does not distinguish between winners and losers"). In this case, the Court does not base its finding of bad faith on the fact that defense counsel requested the particular language, but rather on the fact that (1) defense counsel initially sent plaintiff's counsel a proposed release, then almost two months later maintained that the release proposed by defense counsel itself was not acceptable, (2) defense counsel failed to respond to plaintiff's counsel's attempts to discuss or negotiate the language of the release, and (3) defense counsel participated in three telephone conferences with the Court and failed each time to mention the issue of the language of the release, despite the Court's explicitly asking defense counsel what was holding up settlement.[23]

**22.** The Court notes that the although a variation on the language was ultimately incorporated into the release, plaintiff's counsel consented to the incorporation only at the request of the Court, and only with additional, limiting language suggested by the Court. The Court made no finding as to the propriety or necessity of the language suggested by defense counsel. 9/22 Tr. at 9–10. Moreover, the language was never incorporated into the Compromise Order. Despite Mr. Di Pippo's prior adamancy that the Compromise Order contain the requested added release language, at the September 22 conference Mr. Wolk readily agreed that such language was unnecessary. 9/22 Tr. at 6.

**23.** Mr. Wolk also maintains that Mr. Mains' position that the added release language demanded by defense counsel could preclude plaintiff's suit against Dr. L. Harrison Pillsbury in Washington, D.C. was unreasonable, relying on New York General Obligations Law § 15–108. 9/22 Tr. at 35–37; September 28

letter, at 11–12. The Court notes that § 15–108 merely provides that the release of one tort feasor does not automatically release any other tort feasor, unless the terms of the release expressly so provide. In this case, the language requested by Mr. Wolk expressly released "all other tort feasors ... liable or claimed to be liable with the MOUNT SINAI MEDICAL CENTER a/k/a MOUNT SINAI HOSPITAL who are ... owed any obligation of indemnity by MOUNT SINAI MEDICAL CENTER a/k/a MOUNT SINAI HOSPITAL, its agents, servants, employees, trustees, officers, and volunteers." Mr. Wolk's description of the release on page 12 of his September 28 letter is contrary to the terms of the release he demanded and is misleading.

Moreover, contrary to Mr. Wolk's contention, it is not "self-evident to the Court that in no way shape or form could the terms of the release ... include Dr. Pillsbury," on the basis of § 15–108 or on any other basis. 9/22 Tr. at 36. As stated

Second, on page four, Mr. Wolk argues that because the Federation was not a defendant, Mr. Wolk was under no obligation to produce the representative of the Federation at the September 22 conference, despite the Court's Order to do so. Although this is moot, given that Mr. Wolk produced a representative of the Federation (without voicing any objection at the time), the Court notes that because Mt. Sinai is the defendant in the case and Mt. Sinai agreed to pay the settlement amount, the Court could have directed *Mt. Sinai* to pay the settlement amount *immediately*, and collect from its insurer later. It was only as a courtesy to Mt. Sinai that the Court was willing to attempt to accommodate the internal processing requirements of the Federation, by bringing into the discussion someone who could speak for the Federation's needs.

■ Third, on page 13, Mr. Wolk objects to the Court's selection of August 28 as the date from which interest should run. Mr. Wolk appears simply to misunderstand the Court's explanation regarding the choice of that date. At the September 22 conference, the Court found that the time within which settlement would be accomplished was not a material part of the agreement, solely for the purpose of determining whether plaintiff was free to resume litigation; in other words, so long as settlement was effectuated within a reasonable time, plaintiff was not free to rescind the agreement. 9/22 Tr. at 2–3. *See, Janneh v. GAF Corporation*, 887 F.2d 432, 436 (2d Cir.1989) (where a settlement agreement does not provide any specific time for payment, the law implies a requirement to pay

within a reasonable time). Contrary to Mr. Wolk's assertion, the Court's finding that defense counsel's delay was insufficiently long to permit a resumption of litigation, is not inconsistent with the Court's holding that defense counsel's delay is sanctionable.

■ Defense counsel also argues that the Court's procedure in awarding costs violated due process. However, defense counsel's argument relates solely to the Court's September 22 Order, vacated by Order dated November 2, 1989. Accordingly, this issue is moot.[24]

Finally, although defense counsel did not raise this point, the Court is aware of the Second Circuit's decisions regarding the effect of settlement on motions for costs. *Calloway v. Marvel Entertainment Group*, 854 F.2d 1452, 1482 (2d Cir.1988), *cert. granted, Pavelic & Leflore v. Marvel Entertainment Group*, —— U.S. ——, 109 S.Ct. 1116, 103 L.Ed.2d 179 (1989) (pending motion for sanctions extinguished when case dismissed pursuant to settlement); *Brown v. General Motors Corp., Chevrolet Division*, 722 F.2d 1009, 1011–1012 (2d Cir.1983) (release executed as part of the settlement barred a subsequent claim for attorney's fees under 42 U.S.C. § 1988). These cases are readily distinguishable from the case at hand. In both of those cases, the action was dismissed with the express provision that costs would not be awarded to either party. Neither the dismissal order nor the release in this case makes mention of costs. In addition, in both Second Circuit cases the award of costs would have been based on the attor-

---

above, § 15–108 does not address the issue raised by Mr. Mains, which is whether Dr. Pillsbury could claim a right of indemnity against Mt. Sinai or its employees. In addition, assuming, without deciding, that Mr. Wolk is correct that this issue is governed by New York law, 9/22 Tr. at 37–38, the Court notes that New York ·recognizes "implied in law" indemnity. *See, Peoples' Democratic Republic of Yemen v. Goodpasture, Inc.*, 782 F.2d 346, 351 (2d Cir. 1986). Although the Court does not have sufficient information to decide whether Dr. Pillsbury would have a right to be indemnified by Mt. Sinai or its employees, based on the information available to the Court such a claim would not appear to be frivolous. Accordingly,

Mr. Mains' objection to the requested language was not unreasonable.

**24.** The Court notes that although plaintiff's counsel did not submit formal motion papers requesting sanctions, it was within the Court's discretion to consider the motion on the basis of Mr. Mains' September 21 letter. Indeed, the Court could have ordered sanctions pursuant to § 1927 *sua sponte*, so long as defense counsel had notice and an opportunity to be heard. *See, Braley v. Campbell*, 832 F.2d at 1515; *Brown v. Nationwide Mutual Insurance Co.*, 805 F.2d 1242, 1244 (5th Cir.1986); *North American Foreign Trading Corp. v. Zale Corp.*, 83 F.R.D. 293, 297 (S.D.N.Y.1979).

ney's conduct during the litigation, prior to settlement. In contrast, the costs and attorney's fees sought here relate solely to conduct occurring after the settlement agreement had been reached and the case dismissed. Unlike the parties in *Calloway,* here the parties could not possibly have intended the July 27 agreement to be a settlement of plaintiff's motion for post-settlement costs, because the offending conduct giving rise to the motion had not yet occurred.

## D. Defense Counsel's Cross–Motion

■ Defense counsel cross-moves for sanctions by letter to the Court from Mr. Di Pippo dated November 8. This motion is without merit. First, defense counsel asserts that plaintiff's counsel did not forward a proposed Petition and Order in a timely fashion. However, Mr. Mains notified the Court and defense counsel that he would begin work on the settlement documents upon his return from a long-planned one week vacation (*see* fn. 3, *supra*); Mr. Mains forwarded the documents to defense counsel one week after his return.

■ Second, defense counsel claims that plaintiff's counsel did not notify the Court of any additional obstacles to settlement. However, the burden was on Mr. Wolk to bring the issue to the Court's attention. The Court specifically asked Mr. Wolk, not Mr. Mains, what was holding up settlement, and Mr. Wolk represented to the Court and to Mr. Mains that the *only thing* holding up settlement was the payment of expert fees. As soon as defense counsel notified Mr. Mains (by means of Mr. Di Pippo's September 18 letter) that their position had changed, Mr. Mains immediately raised the additional issues with the Court.

■ Third, defense counsel claims that plaintiff's counsel misrepresented the function of the Virginia court and the Virginia court documents in his August 29 letter. This allegation is based on defense counsel's claim that defense counsel recently called the Clerk of the Circuit Court for the City of Alexandria and obtained the Court Clerk's view that it would be appropriate to include certain language in a Compromise Order. Mr. Di Pippo states:

> that in fact there is no problem whatsoever in including the exact same language in the Order Approving Compromise of Wrongful Death Claim. We also inquired as to the appropriateness of outstanding expert fees in such an Order and once again it was indicated that this too is appropriate.

November 8, 1989 Letter from Mr. Di Pippo to Judge Wood, at 3. Even assuming that defense counsel accurately explained the situation to the Court Clerk and accurately reported the Court Clerk's response, and that the Court Clerk is correct, the statement is irrelevant to this case. Whether or not a Virginia Court would *accept* a Compromise Order containing a release and a provision for the payment of experts has no bearing on the fact that (1) it was unnecessary to include a release in the Compromise Order (*see* page 598, *supra*), and (2) the payment of expert fees was not part of the settlement in this case (*see* page 602, *supra*).

Defense counsel's remaining claims are simply contrary to fact. First, plaintiff's counsel never refused to follow the Court's Order regarding expert fees. *See,* fn. 10, *supra.* Second, plaintiff's counsel did not "refus[e] to choose one of the options" suggested by the Court regarding the payment of the expert fees. *See,* 9/19 Tr. at 13 ff. Finally, plaintiff's counsel did not fail to respond to defense counsel's August 23 offer to supply a copy of Dr. Edelson's bill. On September 6, "plaintiff's counsel telephoned Mr. Wolk and explained that no bill for Edelson had ever been received." October 5 Letter from Mr. Mains to Judge Wood, ¶ 8. Mr. Wolk concedes that he spoke with Mr. Mains regarding the expert bills on that date. September 28 Letter from Mr. Wolk to Judge Wood, at 2.

Accordingly, defendant's motion pursuant to 28 U.S.C. § 1927 is hereby denied.

## CONCLUSION

For the reasons set forth above, the Court finds that defense counsel violated 28 U.S.C. § 1927 by in bad faith (1) failing

to communicate reasonably with plaintiff's counsel regarding the wording of the settlement documents and the payment of the expert fees, (2) failing to communicate reasonably with *the Court* regarding the effectuation of settlement, (3) using the nonpayment of expert fees to delay effectuation of settlement, and (4) failing to be adequately prepared to effectuate the settlement.

Accordingly, counsel for defendant is hereby ordered to pay all reasonable costs and expenses, including attorney's fees, incurred by plaintiff in effectuating settlement that resulted from defense counsel's bad faith conduct. Counsel for plaintiff is directed to submit an affidavit of fees and expenses, with supporting documentation, by November 29, 1989. Counsel for defendant may respond to the affidavit by December 6, 1989. In addition, counsel for defendant is hereby ordered to pay to plaintiff immediately interest on the settlement amount, from August 28, 1989 to October 2, 1989. Defendant's motion for sanctions is hereby denied.

SO ORDERED.