## HALL ET AL. v. COLE

No. 72–630. Argued March 21, 1973—Decided May 21, 1973

[black redaction block]

1

2

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, STEWART, BLACKMUN, and POWELL, JJ., joined. WHITE, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post,* p. 16. MARSHALL, J., took no part in the consideration or decision of the case.

*Howard Schulman* argued the cause and filed a brief for petitioners.

*Burton H. Hall* argued the cause and filed a brief for respondent.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This case requires us to consider the propriety of an award of counsel fees to a successful plaintiff in a suit brought under § 102 of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 523, 29 U. S. C. § 412.[1] On August 6, 1962, at a regular meeting of the membership of petitioner Seafarers International Union of North America—Atlantic, Gulf, Lakes and Inland Waters District, respondent introduced a set of resolutions alleging various instances of undemocratic actions and shortsighted policies on the part of union officers.

---

*J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

*Melvin L. Wulf* and *Sanford J. Rosen* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

[1] Section 102 of the Act, 29 U. S. C. § 412, provides in pertinent part:

"Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate."

The resolutions were defeated and, on November 26, 1962, respondent was expelled from the union on the ground that his presentation of the resolutions violated a union rule proscribing "deliberate or malicious vilification with regard to the execution or the duties of any office or job." After exhausting his intra-union remedies, respondent filed this suit under § 102 of the LMRDA, claiming that his expulsion under these circumstances violated his right of free speech as secured by § 101 (a)(2) of the Act, 29 U. S. C. § 411 (a)(2).[2]

On May 27, 1964, the United States District Court for the Eastern District of New York issued a temporary injunction restoring respondent's membership in the union, and the United States Court of Appeals for the Second Circuit affirmed. 339 F. 2d 881 (1965). Some five years later, the case came on for trial and the District Court, finding a violation of respondent's rights under § 101 (a)(2), ordered him permanently reinstated to membership in the union and, although denying respondent's damages claims,[3] granted him counsel fees in the sum of $5,500 against the union. The Court of

_____

[2] Section 101 (a)(2) of the Act, 29 U. S. C. § 411 (a)(2), provides:

"Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."

[3] In its unreported opinion, the District Court found that respondent "suffered no loss of wages as a result of his expulsion from the union." And although respondent "was deprived of his right

Appeals affirmed in all respects, 462 F. 2d 777 (1972). We granted certiorari limited to the questions whether (1) an award of attorneys' fees is permissible under § 102 of the LMRDA, and (2) if so, whether such an award under the facts of this case constituted an abuse of the District Court's discretion. 409 U. S. 1074. We affirm.

## I

Although the traditional American [4] rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory [5] or contractual authorization, [6] federal courts,

to attend meetings, and run for union office" during the period of his expulsion, the District Court concluded that "[t]he record is barren of any proof on which the court might make a determination of the value of [these rights]." Finally, the court denied respondent's claim for punitive damages on the ground that the union's decision to expel respondent was motivated neither by malice nor bad faith.

[4] The American rule, it might be noted, is more restrictive than the general rule that prevails in most other nations. See, e. g., Ehrenzweig, Reimbursement of Counsel Fees and the Great Society, 54 Calif. L. Rev. 792, 793 (1966). Many commentators have argued for a "liberalization" of the American rule. See, e. g., Stoebuck, Counsel Fees Included in Costs: A Logical Development, 38 U. Colo. L. Rev. 202 (1966); Ehrenzweig, supra; Kuenzel, The Attorney's Fee: Why Not a Cost of Litigation?, 49 Iowa L. Rev. 75 (1963); McCormick, Counsel Fees and Other Expenses of Litigation as an Element of Damages, 15 Minn. L. Rev. 619 (1931); Comment, The Allocation of Attorney's Fees After Mills v. Electric Auto-Lite Co., 38 U. Chi. L. Rev. 316 (1971); Note, Attorney's Fees: Where Shall the Ultimate Burden Lie?, 20 Vand. L. Rev. 1216 (1967).

[5] See, e. g., Clayton Act, § 4, 38 Stat. 731, 15 U. S. C. § 15; Communications Act of 1934, § 206, 48 Stat. 1072, 47 U. S. C. § 206; Interstate Commerce Act, § 16, 34 Stat. 590, 49 U. S. C. § 16 (2); Securities Exchange Act of 1934, §§ 9 (e), 18 (a), 48 Stat. 890, 897, 15 U. S. C. §§ 78i (e), 78r (a).

[6] See, e. g., Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U. S. 714, 717 (1967); Hauenstein v. Lynham, 100 U. S. 483 (1880); Day v. Woodworth, 13 How. 363 (1852).

in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require. Indeed, the power to award such fees "is part of the original authority of the chancellor to do equity in a particular situation," *Sprague* v. *Ticonic National Bank,* 307 U. S. 161, 166 (1939), and federal courts do not hesitate to exercise this inherent equitable power whenever "overriding considerations indicate the need for such a recovery." *Mills* v. *Electric Auto-Lite Co.,* 396 U. S. 375, 391–392 (1970) ; see *Fleischmann Distilling Corp.* v. *Maier Brewing Co.,* 386 U. S. 714, 718 (1967).

Thus, it is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." 6 J. Moore, Federal Practice ¶ 54.77 [2], p. 1709 (2d ed. 1972) ; see, *e. g., Newman* v. *Piggie Park Enterprises, Inc.,* 390 U. S. 400, 402 n. 4 (1968) ; *Vaughan* v. *Atkinson,* 369 U. S. 527 (1962) ; *Bell* v. *School Bd. of Powhatan County,* 321 F. 2d 494 (CA4 1963) ; *Rolax* v. *Atlantic Coast Line R. Co.,* 186 F. 2d 473 (CA4 1951). In this class of cases, the underlying rationale of "fee shifting" is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of "bad faith" on the part of the unsuccessful litigant.

Another established exception involves cases in which the plaintiff's successful litigation confers "a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them." *Mills* v. *Electric Auto-Lite, supra,* at 393–394.[7] "Fee shifting"

---

[7] This exception has its origins in the "common fund" cases, which have traditionally awarded attorneys' fees to the successful plaintiff when his representative action creates or traces a "common fund," the economic benefit of which is shared by all members of the class.

is justified in these cases, not because of any "bad faith" of the defendant but, rather, because "[t]o allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense." *Id.*, at 392; see also *Fleischmann Distilling Corp.* v. *Maier Brewing Co., supra,* at 719; *Trustees* v. *Greenough,* 105 U. S. 527, 532 (1882). Thus, in *Mills* v. *Electric Auto-Lite Co., supra,* we approved an award of attorneys' fees to successful shareholder plaintiffs in

---

See, *e. g., Central Railroad & Banking Co.* v. *Pettus,* 113 U. S. 116 (1885); *Trustees* v. *Greenough,* 105 U. S. 527 (1882). In *Sprague* v. *Ticonic National Bank,* 307 U. S. 161 (1939), the rationale of these cases was extended to authorize an award of attorneys' fees to a successful plaintiff who, although suing on her own behalf rather than as representative of a class, nevertheless established the right of others to recover out of specific assets of the same defendant through the operation of *stare decisis.* In reaching this result, the Court explained that the beneficiaries of the plaintiff's litigation could be made to contribute to the costs of the suit by an order reimbursing the plaintiff out of the defendant's assets from which the beneficiaries eventually would recover. Finally, in *Mills* v. *Electric Auto-Lite Co.,* 396 U. S. 375 (1970), we held that the rationale of these cases must logically extend, not only to litigation that confers a monetary benefit on others, but also to litigation " 'which corrects or prevents an abuse which would be prejudicial to the rights and interests' " of those others. *Id.*, at 396, quoting *Bosch* v. *Meeker Cooperative Light & Power Assn.,* 257 Minn. 362, 366–367, 101 N. W. 2d 423, 427 (1960).

Citing our decisions in *Mills, supra,* and *Newman* v. *Piggie Park Enterprises, Inc.,* 390 U. S. 400 (1968), respondent contends that the award of attorneys' fees in this case might also be justified on the ground that, by successfully prosecuting this litigation, respondent acted as a " 'private attorney general,' vindicating a policy that Congress considered of the highest priority." *Id.*, at 402. See also *Knight* v. *Auciello,* 453 F. 2d 852 (CA1 1972); *Lee* v. *Southern Home Sites Corp.,* 444 F. 2d 143 (CA5 1971). In light of our conclusion with respect to the "common benefit" rationale, however, we have no occasion to consider that question.

a suit brought to set aside a corporate merger accomplished through the use of a misleading proxy statement in violation of § 14 (a) of the Securities Exchange Act of 1934, 48 Stat. 895, 15 U. S. C. § 78n (a). In reaching this result, we reasoned that, since the dissemination of misleading proxy solicitations jeopardized important interests of both the corporation and " 'the stockholders as a group,' " [8] the successful enforcement of the statutory policy necessarily "rendered a substantial service to the corporation and its shareholders." *Mills* v. *Electric Auto-Lite Co., supra,* at 396. Under these circumstances, reimbursement of the plaintiffs' attorneys' fees out of the corporate treasury simply shifted the costs of litigation to "the class that has benefited from them and that would have had to pay them had it brought the suit." *Id.,* at 397.

The instant case is clearly governed by this aspect of *Mills.* The Labor-Management Reporting and Disclosure Act of 1959 was based, in part, on a congressional finding "from recent investigations in the labor and management fields, that there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct . . . ." 29 U. S. C. § 401 (b). In an effort to eliminate these abuses, Congress recognized that it was imperative that all union members be guaranteed at least "minimum standards of democratic process. . . ." [9] Thus, Title I [10] of the LMRDA—the "Bill of Rights of Members of Labor Organizations"—was specifically designed to promote the "full and active par-

---

[8] *Mills* v. *Electric Auto-Lite Co., supra,* at 392, quoting *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 432 (1964).

[9] 105 Cong. Rec. 6471 (1959) (Sen. McClellan).

[10] 29 U. S. C. §§ 411–415.

ticipation by the rank and file in the affairs of the union," [11] and, as the Court of Appeals noted, the rights enumerated in Title I [12] were deemed "vital to the independence of the membership and the effective and fair operation of the union as the representative of its membership." 462 F. 2d, at 780. See also *International Assn. of Machinists* v. *Nix,* 415 F. 2d 212 (CA5 1969); *Salzhandler* v. *Caputo,* 316 F. 2d 445 (CA2 1963).

Viewed in this context, there can be no doubt that, by vindicating his own right of free speech guaranteed by § 101 (a)(2) of Title I of the LMRDA, respondent necessarily rendered a substantial service to his union as an institution and to all of its members. When a union member is disciplined for the exercise of any of the rights protected by Title I, the rights of all members of the union are threatened. And, by vindicating his own right, the successful litigant dispels the "chill" cast upon the rights of others. Indeed, to the extent that such lawsuits contribute to the preservation of union democracy, they frequently prove beneficial "not only in the immediate impact of the results achieved but in their implications for the future conduct of the union's affairs." *Yablonski* v. *United Mine Workers of America,* 150 U. S. App. D. C. 253, 260, 466 F. 2d 424, 431 (1972). Thus, as in *Mills,* reimbursement of respondent's attorneys' fees

---

[11] *American Federation of Musicians* v. *Wittstein,* 379 U. S. 171, 182–183 (1964).

[12] In addition to the Tit. I guarantee of freedom of speech and assembly involved in this case, 29 U. S. C. § 411 (a)(2), see n. 2, *supra,* Tit. I also guarantees equal "political" rights to all union members, 29 U. S. C. § 411 (a)(1); stability and fairness in the assessment of dues, initiation fees, and other assessments, 29 U. S. C. § 411 (a)(3); the right of all union members to sue and to participate in litigation, 29 U. S. C. § 411 (a)(4); and procedural fairness in the discipline process, 29 U. S. C. § 411 (a)(5).

out of the union treasury [13] simply shifts the costs of litigation to "the class that has benefited from them and that would have had to pay them had it brought the suit." *Mills* v. *Electric Auto-Lite Co., supra,* at 397. See also *Yablonski* v. *United Mine Workers of America, supra; Robins* v. *Schonfeld,* 326 F. Supp. 525 (SDNY 1971); *Cefalo* v. *International Union of District 50 United Mine Workers,* 311 F. Supp. 946 (DC 1970); *Sands* v. *Abelli,* 290 F. Supp. 677 (SDNY 1968). We must therefore conclude that an award of counsel fees to a successful plaintiff in an action under § 102 of the LMRDA falls squarely within the traditional equitable power of federal courts to award such fees whenever "overriding considerations indicate the need for such a recovery." *Mills* v. *Electric Auto-Lite Co., supra,* at 391–392.

## II

This does not end our inquiry, however, for even where "fee-shifting" would be appropriate as a matter of equity, Congress has the power to circumscribe such relief. In *Fleischmann Distilling Corp.* v. *Maier Brewing Co., supra,* for example, we held that § 35 of the Lanham Act, 60 Stat. 439, 15 U. S. C. § 1117, precluded an award of attorneys' fees as a separate element of recovery in a suit for deliberate infringement of a trademark. In reaching that result, we reasoned that, since § 35 "meticulously detailed the remedies available to a plaintiff

---

[13] Petitioners contend that the payment of counsel fees out of the union treasury might deplete union funds to such an extent as to impair the union's ability to operate as an effective collective-bargaining agent and to endanger union stability. Although this consideration is undoubtedly an important one, it is relevant, not to the *power* of federal courts to award counsel fees generally, but, rather, to the exercise of the District Court's discretion on a case-by-case basis. See n. 23, *infra.*

who proves that his valid trademark has been infringed," Congress must have intended the express remedial provisions of § 35 "to mark the boundaries of the power to award monetary relief in cases arising under the Act." *Id.*, at 719, 721. Petitioners contend that this reasoning dictates a similar conclusion with respect to § 102 of the LMRDA. We do not agree. Unlike § 35 of the Lanham Act, which specifically "provided not only for injunctive relief, but also for compensatory recovery measured by the profits that accrued to the defendant by virtue of his infringement, the costs of the action, and damages which may be trebled," [14] § 102 of the LMRDA broadly authorizes the courts to grant "such relief (including injunctions) as may be appropriate." 29 U. S. C. § 412. Thus, § 102 does not "meticulously detail the remedies available to a plaintiff," and we cannot fairly infer from the language of that provision an intent to deny to the courts the traditional equitable power to grant counsel fees in "appropriate" situations.

Petitioners argue further, however, that because Congress expressly authorized the recovery of counsel fees in §§ 201 (c) and 501 (b) of the LMRDA, 29 U. S. C. §§ 431 (c), 501 (b), the absence of a similar express provision in § 102 indicates an intent to preclude "fee-shifting" in suits brought under that section. Sections 201 (c) and 501 (b), which are not a part of Title I, deal with narrowly defined problems under the Act, and specifically authorize such limited remedies as an examination of the union's books and records and an accounting.[15] By contrast, § 102 was premised upon the fact

---

[14] *Fleischmann Distilling Corp.* v. *Maier Brewing Co., supra,* at 719.

[15] Section 201 (c) provides for the award of counsel fees in a suit brought by a union member to obtain access to union books, records, and accounts to verify annual financial statements. 29 U. S. C. § 431 (c). Section 501 (b) authorizes "fee shifting" in a suit brought

that Title I litigation necessarily demands that remedies "be tailored to fit facts and circumstances admitting of almost infinite variety," [16] and § 102 was therefore cast as a broad mandate to the courts to fashion "appropriate" relief. Indeed, any attempt on the part of Congress to spell out all of the remedies available under § 102 would create the "danger that those [remedies] not listed might be proscribed with the result that the courts would be fettered in their efforts to 'grant relief according to the necessities of the case.' " *Gartner* v. *Soloner,* 384 F. 2d 348, 353 (CA3 1967). See *Fleischmann Distilling Corp.* v. *Maier Brewing Co., supra.* Confronted with a virtually identical situation in *Mills,* we explained that the inclusion in certain sections of the Securities Exchange Act of 1934 of express provisions for recovery of attorneys' fees "should not be read as denying to the courts the power to award counsel fees in suits under other sections of the Act when circumstances make such an award appropriate . . . ." 396 U. S., at 390–391. That reasoning is equally persuasive today.[17]

Finally, petitioners call our attention to two isolated comments in the legislative history of Title I—one by Senator Goldwater in his testimony before a House Com-

---

by a member against a union official to recover damages or for an accounting for the benefit of the union on the ground that the official is violating his duties. 29 U. S. C. § 501 (b).

[16] *Gartner* v. *Soloner,* 384 F. 2d 348, 353 (CA3 1967).

[17] Indeed, the *Mills* reasoning may be particularly appropriate with respect to the LMRDA. As Professor Cox has noted, "because much of the bill was written on the floor of the Senate or House of Representatives and because many sections contain calculated ambiguities or political compromises . . . , the courts would be well advised to seek out the underlying rationale without placing great emphasis upon close construction of the words," Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich. L. Rev. 819, 852 (1960).

mittee [18] and the other contained in a dissenting statement to a House Committee Report [19]—expressing the fear that, in the absence of a specific provision for the award of counsel fees, such relief would be unavailable in suits brought under § 102. Although these statements plainly indicate "a feeling by some members of the Congress that it would have been desirable and prudent to spell out unmistakably a right to attorney's fees," they "hardly amount to a definitive and absolute setting of the Congressional face against the giving of such incidental relief by the courts where compatible with sound and established equitable principles." *Yablonski* v. *United Mine Workers of America,* 150 U. S. App. D. C., at 258, 466 F. 2d, at 429. See *Gartner* v. *Soloner, supra,* at 352. Indeed, both of these comments expressly *favored* the allowance of counsel fees in Title I litigation, and there is no suggestion anywhere in the

---

[18] In his testimony before the House Committee on Education and Labor, after passage of the Senate version of the LMRDA, Senator Goldwater stated that "the bill does not grant [the union member], even where successful in his suit, reasonable counsel fees or other costs. It thus forces him to assume the entire financial burden of the litigation. For an ordinary rank-and-file union member who is generally a wage worker, such a litigation thus becomes an impossible financial burden." 105 Cong. Rec. 10095 (1959).

[19] In opposing the reporting of the Elliott bill, H. R. 8342, 86th Cong., 1st Sess. (1959), to the House, the nine dissenting Members of the House Committee on Education and Labor protested that "[u]nder that bill the individual member must shoulder the burden of litigation costs himself." H. R. Rep. No. 741, 86th Cong., 1st Sess., 95 (1959). At the end of their criticisms of the Elliott bill, the dissenters explained that "[f]or the reasons outlined above, we intend to support . . . the so-called Landrum-Griffin bill (H. R. 8400 and 8401)." *Id.,* at 98. Thus, although the enforcement provisions of the Elliott bill and the Landrum-Griffin bill were virtually identical, the dissenters apparently believed that the latter, which eventually was enacted, allowed the union member to recover counsel fees.

legislative history that even a single member of Congress was opposed to such relief or desired the words "such relief . . . as may be appropriate" to restrict the historic equity powers of the federal courts. On the contrary, there are numerous expressions by sponsors and other supporters of the Act indicating that § 102 was intended to afford the courts "a wide latitude to grant relief according to the necessities of the case," [20] and "to give such relief as [the court] deems equitable under all the circumstances." [21]

Moreover, the award of attorneys' fees under § 102 is clearly consonant with Congress' express desire to adopt "legislation that will afford necessary protection of the rights and interests of employees and the public generally . . . ." 29 U. S. C. § 401 (b). As the Court of Appeals recognized:

"Not to award counsel fees in cases such as this would be tantamount to repealing the Act itself by frustrating its basic purpose. It is difficult for individual members of labor unions to stand up and fight those who are in charge. The latter have the treasury of the union at their command and the paid union counsel at their beck and call while the member is on his own. . . . An individual union member could not carry such a heavy financial burden. Without counsel fees the grant of federal jurisdiction is but a gesture for few union members could avail themselves of it." 462 F. 2d, at 780–781.

Thus, it is simply "untenable to assert that in establishing the bill of rights under the Act Congress intended to have those rights diminished by the unescapable fact that

---

[20] 105 Cong. Rec. 15548 (1959) (Rep. Elliott).

[21] *Id.*, at 6717 (Sen. Kuchel). See *id.*, at 15864 *et seq.* (Rep. O'Hara); see also 29 U. S. C. §§ 413, 523 (a).

an aggrieved union member would be unable to finance litigation . . . ." *Gartner* v. *Soloner, supra,* at 355. See *Yablonski* v. *United Mine Workers of America, supra,* at 259, 466 F. 2d, at 430; *Robins* v. *Schonfeld,* 326 F. Supp., at 531; *Sands* v. *Abelli,* 290 F. Supp., at 686; cf. *Newman* v. *Piggie Park Enterprises, Inc.,* 390 U. S., at 402. We therefore hold that the allowance of counsel fees to the successful plaintiff in a suit brought under § 102 of the LMRDA is consistent with both the Act and the historic equitable power of federal courts to grant such relief in the interests of justice.

### III

Finally, petitioners maintain that the award of counsel fees to respondent under the facts of this case constituted an abuse of the District Court's discretion. Specifically, petitioners argue that the District Court's finding that some of respondent's actions "were, in part, motivated by [his] political ambitions for union office" represents a finding of "bad faith" on the part of respondent. The District Court clearly rejected the "logic" of this contention, and we agree. Title I of the LMRDA was specifically designed to protect the union member's right to seek higher office within the union,[22] and we can hardly accept the proposition that the exercise of that right is tantamount to "bad faith." See *Yablonski* v. *United Mine Workers of America, supra,* at 259–260, 466 F. 2d, at 430–431.

----

[22] In describing to the Senate the various "offenses" for which a union member could be expelled under then-existing union constitutions, Senator McClellan pointed out in particular the "offense" of "applying for the position of another union man in office." He observed, with evident sarcasm, that: "A member had better not do that. The officers have squatters' rights. Members had better not offer any competition. They had better not seek election. They had better not aspire to the presidency or the secretaryship, or they will be expelled or disciplined." 105 Cong. Rec. 6478 (1959).

Petitioners also contend that the award of attorneys' fees in this case was improper because the District Court, in denying respondent's claim for punitive damages, found that "the defendants, in good faith, believed that they had a right to charge and discipline [respondent] for his actions." It is clear, however, that "bad faith" may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation. And, as the Court of Appeals noted, the conduct of this particular litigation was marked by "the dilatory action of the union and its officers . . . ." 462 F. 2d, at 780. Moreover, although the presence of "bad faith" is essential to "fee-shifting" under a "punishment" rationale, neither the presence nor absence of "bad faith" is in any sense dispositive where attorneys' fees are awarded to the successful plaintiff under the "common benefit" rationale recognized in *Mills* and operative today. Under that theory, counsel fees are granted, not because of the "bad faith" of the defendant but, rather, because the litigation confers substantial benefits on an ascertainable class of beneficiaries. In that situation, the element of "bad faith" of the defendant is simply one of many considerations best addressed to the sound discretion of the District Court.[23] Under the facts of this case, we cannot say that the District Court abused that discretion.

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

---

[23] Another such consideration is, of course, the extent to which the payment of the plaintiff's counsel fees out of the union treasury might impair the union's ability to operate effectively. See n. 13, *supra*. Here, petitioners do not, and indeed cannot, contend that the award of only $5,500 would in any sense jeopardize union stability.

MR. JUSTICE WHITE, with whom MR. JUSTICE REHN-QUIST joins, dissenting.

I would need a far clearer signal from Congress than we have here to permit awarding attorneys' fees in member-union litigation, which so often involves private feuding having no general significance. The award of fees in the occasionally successful and meritorious case will not be worth the litigation the Court's decision will invite and foster.