United States v. Calixce          CR-95-031-JD  02/10/98

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

United States of America

         v.                          Criminal No. 95-31-01-JD

Jean Baptiste Calixce


O R D E R


The defendant, Jean-Baptiste Calixce, is charged with knowing, intentional, and unlawful possession with the intent to distribute cocaine and cocaine base ("crack") in violation of 21 U.S.C. § 841(a)(1).  Before the court is the defendant's motion to suppress evidence (document no. 15).


Background[1]

On March 12, 1995, Manchester, New Hampshire Police Detective Robert Freitas received information from a confidential informant whom he personally knew to be reliable.  The informant relayed, inter alia, the following information:  (1) Guy Legrande, a five foot, seven inch tall black Haitian male, with green eyes and brown hair, was recruiting white female drug couriers to transport drugs between Aruba, Haiti, and the United

_____

[1]The events described in this section represent the findings of fact of the court from the hearing, affidavits, and other documents submitted.

States; (2) Melissa Deroscheror Hutchins was at that time a courier intending to transport drugs between Aruba, Haiti, and the United States; (3) the informant had been recruited to travel with Ms. Hutchins and had declined; (4) Guy Legrande was residing at the Susse Chalet in Manchester, New Hampshire, and was possibly moving to the Day's Inn in Manchester, New Hampshire; (5) Guy Legrande was registered under the name surname "Keith"; (6) Guy Legrande drove a grey Acura, and kept his drugs in the trunk; and (7) the informant had observed approximately one kilogram of cocaine in the trunk of the car a few days prior to contacting the police. See Breckinridge Aff. at 1-3.

On the basis of this information, two members of the Manchester Police Department's Special Investigations Unit, Detective Breckinridge and Detective Stankiewicz, and an agent of the United States Immigration and Naturalization Service ("INS"), Agent Young, went to the Susse Chalet (collectively "the officers"). Because they failed to find a grey Acura in either the Susse Chalet parking lot or the nearby Day's Inn parking lot, they entered the Susse Chalet lobby to inquire whether anyone was registered under the name Keith. Although there was no one registered under the name Keith, during this transaction a grey Acura arrived and parked in front of the lobby. It was driven by the defendant, a male fitting the description that the informant

2

had given, with a white female occupant in the front passenger seat. See Breckinridge Aff. at 1-2.

The defendant exited the automobile and entered the lobby of the Susse Chalet. Detective Breckinridge and Agent Young followed him into the lobby, while Detective Stankiewicz remained outside in the parking lot. See id. None of the officers were in uniform, their weapons were not exposed, and they were driving unmarked police cars. Detective Breckinridge and Agent Young identified themselves to the defendant both verbally and by showing him their badges and photographic identification. Upon request, the defendant produced a driver's license identifying himself as Jean-Baptiste Calixce. He acknowledged, however, that he used Guy Legrande as an alias because he was married and did not want other females to know his true name. When asked, he denied each allegation of the informant, and stated he was not involved with drugs. See id. at 3-4.

Detective Breckinridge left the lobby and indicated to Detective Stankiewicz that he should question the female occupant of the car. It is unclear whether Stankiewicz was already in the process of doing so. See id.; Transcript of Hr'g on Def.s' Mot. to Suppress at 11-13 (hereinafter "Tr."). Detective Breckinridge then reentered the lobby and returned to where the defendant and Agent Young were sitting. Agent Young took the defendant's

3

driver's license with him while he called into the INS office to inquire into the defendant's status as a foreigner in the United States. Meanwhile, Detective Breckinridge proceeded to ask the defendant who owned the car, whether there were any drugs in the car, and whether he could look in the vehicle for drugs. See Breckinridge Aff. at 5. Detective Breckinridge did not inform the defendant that he could refuse to consent to the search. The tone of this dialogue was conversational. See Tr. at 23. No threat of force was used, nor were any weapons exposed. See id. The defendant consented to the search of his automobile. See, e.g., id. at 13. Detective Breckinridge and the defendant then walked to the outer lobby where Agent Young was on a pay phone with the INS. Detective Breckinridge asked a second time whether he could search the automobile the defendant was driving. Again, in front of Agent Young, the defendant consented to the search. See id. at 15-16, 22-23. Detective Breckinridge then asked the defendant to accompany himself and Agent Young out to the automobile. See id. at 30.

At the automobile, Detective Stankiewicz had already ascertained that the female was Hutchins. See Breckinridge Aff. at 4. Hutchins indicated that she did not know the defendant well, but that the car belonged to him. Detective Breckinridge reached into the cabin of the automobile and removed the keys

4

from the ignition to open the trunk.  See id. at 5.  Inside the trunk there was a jacket.  While the trunk and jacket were being searched, the defendant began to walk away from the automobile.  In response to requests from the officers, he returned to the vehicle and stood by while the search was being conducted.  Cocaine and cocaine base were found in a jacket in the trunk of the car.  At this point in time, the defendant was pat frisked, handcuffed and arrested.  See id.

## Discussion[2]

The defendant seeks to suppress the evidence and any statements obtained during the search because:  (1) there was no probable cause for the police to detain the defendant or to search the car; (2) no consent was given to detain the defendant or to search the car; and (3) if consent was given, it was not voluntary.  The defendant argues that his consent was given involuntarily because:  (1) the search was in process at the time the consent was given; (2) he was being detained or was in the custody of the police at the time the consent was given; and (3) because he was Haitian and not American, he lacked the knowledge and understanding to make a knowing relinquishment of his rights.

---

[2]This section contains additional findings of fact, and the court's conclusions of law.

5

WAS THE INITIAL DETENTION CONSTITUTIONAL?

The defendant argues that the officers did not have probable cause to detain him. See Def.'s Mem. of Law in Support of Mot. to Suppress at 3-6 (hereinafter "Def.'s Mem."). Even a brief detention of an individual by law enforcement officers may implicate Fourth Amendment protections against unreasonable searches and seizures. See United States v. Hensley, 469 U.S. 221, 226 (1985). This court assumes, arguendo, that the initial encounter between the officers and the defendant prior to the search of the automobile did implicate Fourth Amendment issues. However, an officer may detain an individual to investigate the officer's reasonable suspicion if it is based on specific and articulable facts. See, e.g., id. Contrary to the defendant's assertion, an officer does not need probable cause to make such an investigatory stop. See, e.g., id.; see also Alabama v. White, 496 U.S. 325, 329-30 (1990) (comparing probable cause and reasonable suspicion standards). The court must engage in a two step analysis in reviewing the constitutionality of a brief investigatory stop. First, the court must consider whether "'the officer's action was justified at its inception; and second, whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first

6

place.'" <u>United States v. Kimball</u>, 25 F.3d 1, 6 (1st Cir. 1994) (quoting <u>United States v. Walker</u>, 924 F.2d 1, 3 (1st Cir. 1991)). In short, there must specific, articulable facts, coupled with rational inferences drawn from those facts, that justify a reasonable suspicion that criminal activity has occurred or is imminent. <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968). The stop must then be related in scope to the suspicion. <u>See</u> <u>Kimball</u>, 25 F.3d at 6. The court "consider[s] the totality of the circumstances which confronted the officer at the time of the stop." <u>Id.</u>

In the case at hand, the police had been given information from an informant who was known personally to Detective Robert Freitas to be reliable. <u>See</u> Breckinridge Aff. at 1, 2. When the officers began their investigation, the information was quickly corroborated by the evidence they found. The detailed information given could not have been generally known to the public. A man fitting the description given by the informant was staying in the Susse Chalet Hotel. He was driving a grey Acura. At this point the detective reasonably requested the defendant's identification and asked if he knew of the individual the informant had named, or if he had ever identified himself as such. The defendant indicated that the name given by the informant was an alias he used. Moreover, the defendant was

7

accompanied by a female which one of the police officers knew to be Melissa Hutchins, the woman that the informant had identified as a probable courier for the defendant. See Breckinridge Aff. at 4. The court therefore concludes based on the totality of the circumstances that the officers had a reasonable suspicion, founded on specific and articulable facts, to detain the defendant. See Alabama v. White, 496 U.S. at 326-27, 331-32 ("[B]ecause the informant is shown to be right about some things, he is probably right about facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity.").

Moreover, the court concludes that the actions taken by the officers were "reasonably related in scope to the circumstances which justified the interference in the first place." Walker, 924 F.2d at 3. The entire discussion took place in the lobby of the hotel, and there are no allegations that it was unduly prolonged. See Tr. at 9-11, 13-16. The questions asked were directly pertinent to the allegations against the defendant. The request to search the car was a direct result of the allegation that the defendant kept cocaine in the trunk of the car. Therefore, the court concludes that the minor intrusion of the officers did not result in an impermissible detention of the defendant.

8

As a final matter, at the hearing the defendant's counsel raised the novel argument that the defendant was in custody immediately upon encountering the police, and therefore was entitled to have his <u>Miranda</u> rights read to him.  The court finds this argument meritless.  The facts do not support a finding that the defendant was in police custody until after the police searched his automobile.  At all times after his initial contact with the officers, the defendant was in the presence of at least one of them.  <u>See</u> Tr. at 16.  However, this presence was informal.  When Agent Young was left alone with the defendant, Agent Young merely sat in the same area of the lobby as the defendant.  <u>See</u> <u>id.</u> at 11-12.  The officers never told the defendant he could not leave.  <u>See</u> <u>id.</u> at 18.  He was not restrained in any way until the search revealed the cocaine and cocaine base.  <u>See</u> <u>id.</u> at 23.  After he gave his consent, the defendant was asked if he would accompany Detective Breckinridge to the automobile.  The defendant agreed and voluntarily walked out to the automobile, returning to the automobile a second time upon the officers' request to "hang on for a minute."  <u>See</u> <u>id.</u> at 30; Breckinridge Aff. at 5-6.  The court finds that these facts fail to indicate "there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)

9

(quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)).

WAS THE CONSENT VOLUNTARY?

It is firmly established that under the Fourth and Fourteenth Amendments "a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1972) (quoting <u>Katz v. United States</u>, 389 U.S. 347, 357 (1972)). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." <u>Id.</u> It is the government's burden to prove that "the necessary consent was obtained and that it was freely and voluntarily given." <u>Florida v. Royer</u>, 460 U.S. 491, 497 (1983). A court assesses the "totality of the circumstances" in determining whether a defendant's consent to a search was voluntary. <u>United States v. Barnett</u>, 989 F.2d 546, 555 (1st Cir. 1993). Among the factors to be considered are the defendant's "age, education, experience, intelligence, and knowledge of the right to withhold consent[, in addition to] whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means

10

or under inherently coercive circumstances," id., as well as the nature of the "environment in which it took place," Schneckloth, 412 U.S. at 247. However, "it is not essential that the officers first inform the consenting party of the right to withhold consent, though knowledge of the right to withhold consent is a factor to be considered in assessing voluntariness . . . ." Barnett, 989 F.2d at 555. Finally, there is a "heightened possibility of coercion . . . when a defendant's consent is obtained during custody," Barnett, 989 F.2d at 555, although "custody alone has never been enough in itself to demonstrate a coerced confession or consent to search," United States v. Watson, 423 U.S. 411, 424 (1976).

The defendant contends that he did not agree to the search of his car. See Calixce Aff., ¶ 9. Detective Breckinridge testified that the defendant first consented alone with Detective Breckinridge, and then a second time at Detective Breckinridge's request in front of Agent Young. Agent Young also testified that the defendant consented to the search in his presence. Their testimony was forthright and credible and their accounts corroborate each other. There is no allegation that the defendant protested the search once it began, which might otherwise indicate the defendant's objection to the search. The court finds that the defendant did in fact consent to the search

11

of the automobile.

The defendant alternatively argues that any consent, if given, was involuntary. Def.'s Mem. at 6-7. As indicated above, a court evaluates the totality of the circumstances when reviewing a claim that consent was given involuntarily. Here, the consent was given and the search took place in a public space -- the lobby and parking lot of a hotel. See Tr. at 13; see also, e.g., United States v. Barahona, 990 F.2d 412, 417 (8th Cir. 1993) (comparing relevance of public and private locations). The dialogue between Detective Breckinridge and the defendant was in a conversational tone. See Tr. at 23. The officers were in plainclothes, without weapons or handcuffs exposed. See id. at 17-18, 21. It is not alleged that they made any threats. See, e.g., id. at 18. The defendant was not restrained. See id. at 23. The court finds no indications of coercion during the time the events in question were occurring. Moreover, the defendant is an adult, and there is no suggestion that he is of low intelligence. See Def.'s Mem., Ex. A at 1. Nor does the defendant have any discernable difficulty conversing in English. The officers' testimony did not indicate that they had any trouble speaking with the defendant, nor did they perceive any difficulty on the defendant's part. See Tr. at 10, 23. Indeed, at the hearing the defendant did not require the assistance of an

interpreter. When the court took judicial notice of this, counsel for the defendant indicated that the defendant understands English: "That's not the issue. . . [H]e does understand English." Tr. at 34.[3]

The defendant maintains, however, that the consent was involuntary because he was being detained when he gave the consent, because the search was already in process when the consent was given, and because he was not informed of his right to refuse consent and as a Haitian did not otherwise have knowledge of it. Def.'s Mem. at 6-7. Although the defendant argues his consent was vitiated by his detention, it is well settled law that an individual's consent is not rendered involuntary merely because it was given while an individual was being detained or was in custody. See, e.g., Watson, 423 U.S. at 424; Barnett, 989 F.2d at 555. Nor does the law require that a police officer appraise an individual of his right to refuse to consent to a search. See Schneckloth, 412 U.S. 218, 227, 231 (1972); Barnett, 989 F.2d at 555. Moreover, it is not necessary that the government prove the individual had knowledge of his right to refuse to consent. See Schneckloth v. Bustamonte, 412

_____

[3]The defendant's reliance on Restrepo v. State, 438 So. 2d 76 (1983), is therefore misplaced; Restrepo presented a situation where the defendant did not speak English and the officer asked in broken Spanish to search his luggage in such a way that it could have been interpreted as a demand.

13

U.S. at 232, 233. Although these are factors that bear on the ultimate issue of whether an individual's consent was voluntary, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." Id. Finally, the court finds that the search of the automobile was not initiated until after the defendant had consented. The testimony of the officers and the affidavits submitted corroborate the police reports which clearly indicate that the search was initiated after the defendant had given his consent to the search. See Breckinridge Aff. at 5; Def.'s Mem., Ex. A at 2.

Based on the totality of the circumstances, the court finds that the defendant voluntarily agreed to the search of the automobile. The defendant's "will was not overborne, nor his 'capacity for self determination critically impaired.'" Barnett, 989 F.2d at 556 (quoting Schneckloth, 412 U.S. at 225).[4]

---

[4]In light of the court's conclusion that consent was in fact voluntarily given to search the car, the court need not reach the defendant's arguments that the officers searched the automobile with neither a warrant nor probable cause. See Schneckloth, 412 U.S. at 219 (well settled exception to requirements of warrant or probable cause is consent).

14

## Conclusion

_____The defendant's motion to suppress is denied (document no. 15).

SO ORDERED.


                                    _____
                                    Joseph A. DiClerico, Jr.
                                    District Judge

February 10, 1998

cc:  William R. Sullivan, Esquire
     U.S. Attorney
     U.S. Probation
     U.S. Marshal