**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION.**
File Name: 07a0347n.06
Filed: May 17, 2007

**Appeal No. 06-2024**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| EQUILON ENTERPRISES LLC, d/b/a SHELL OIL PRODUCTS US, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE |
| Plaintiff-Appellee, | ) ) | EASTERN DISTRICT OF MICHIGAN (DETROIT) |
| v. | ) ) | (Case No. 2:05-CV-72899) |
| 12 & EVERGREEN D&D SERVICES, INC., et al., | ) ) ) ) | |
| Defendants-Appellants. | ) ) | |

BEFORE:     ROGERS, COOK, Circuit Judges; and, GWIN, District Judge.[*]

GWIN, District Judge:

In this contracts case, Defendants-Appellants 12 & Evergreen D&D Services, Inc., et al., (collectively, the "Dealers"), appeal the district court's grant of partial summary judgment and award of attorneys' fees to Plaintiff-Appellee Equilon Enterprises LLC, d/b/a Shell Oil Products US ("Shell"). The Dealers say that by modifying its product distribution strategy Shell excused them from their contractual obligations to sell only Shell-branded gasoline in the Detroit market. Responding, Shell admits that it changed its marketing strategy from direct supply to reliance on wholesalers, but denies that this alteration represents a "market withdrawal" under the terms of its

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

contracts with the Dealers. Instead, Shell says that it remains committed to the Detroit market though it assigned certain contracts to wholesalers who must now distribute Shell-branded gasoline to the Dealers.

The district court found that Shell had the better argument. We agree and, accordingly, we **AFFIRM** the district court's grant of summary judgment and award of attorneys' fees to Shell.

## I. Background

Prior to 2004, Shell marketed its gasoline in metropolitan Detroit through franchise relationships with the Dealers, to whom it directly supplied Shell-branded gasoline. In 2004 and 2005, Shell changed its Detroit marketing strategy by dissolving its franchise relationships, selling its service stations to the Dealers under conditional warranty deeds ("Special Warranty Deeds"), and entering into ten-year gasoline supply and purchase contracts with the Dealers ("Retail Sales Agreements").

Separately and also starting in 2004 and 2005, Shell entered into wholesale distribution agreements with True North Energy LLC and Wakefield Oil Company (together, the "Wholesalers"). Shell then assigned the Dealers' Retail Sales Agreements to the Wholesalers. Today, as the result of its altered marketing strategy, Shell sells gasoline to the Wholesalers, who, in turn, brand, sell, and deliver it to the Dealers who then retail the Shell-branded gasoline to consumers throughout Detroit. Shell's assignments did not affect their legal obligations to the Dealers under the Retail Sales Agreements; specifically, Shell remains obligated to provide the Dealers with sufficient quantities of Shell-branded gasoline to meet the Dealers' retail needs.

Arguing that they are excused from the Retail Sales Agreements' requirement that they sell

Shell-branded gasoline, the Dealers cite a provision in the Special Warranty Deed that, they say, excuses their performance because Shell no longer directly supplies gasoline to them. The Dealers say that Shell's reliance on the Wholesalers equates to a "market withdrawal" under the Petroleum Marketing Protection Act, 15 U.S.C. §§ 2801 - 2841(f), and, thus, triggers their right to step away from the contract. In pertinent part, the Brand Covenant provision of the Special Warranty Deed says:

> (2). Brand Covenant.
> (a) Subject to Article 2(c) below, for 10 years from the date of closing Purchaser agrees that if the Premises are used for the sale of motor fuel, the motor fuel must be purchased from Company, or Company's successors or assigns, ("Brand Covenant") and Retailer's Station must be operated pursuant to the terms and conditions of the Retail Sales Agreement, or its replacement.
>
> ***
>
> (c) Purchaser will be excused from complying with the Brand Covenant if Company elects to do a market withdrawal in accordance with the Petroleum Marketing Practices Act from a geographic area that includes the premises.

Upon Shell's assignments to the Wholesalers, the Dealers disavowed the Retail Sales Agreements, contending that Shell had withdrawn from the Detroit market and, in doing so, excused the Dealers from their contractual obligations to sell only Shell-branded gasoline. On August 12, 2005, Shell sued the Dealers to compel their performance under the terms of the Brand Covenant. The Dealers counterclaimed and asserted, *inter alia*, the defense of excuse under the Brand Covenant. On November 30, 2005, Shell moved for partial summary judgment. On December 6, 2005, the Dealers filed a cross-motion for partial summary judgment.

On February 9, 2006, the district court held a hearing to consider the merits of the parties' motions. At the hearing, neither party contested the validity of the assignments, although the

Dealers' counsel appeared to confuse the legal outcome of an assumption of a contract with its assignment.

Further, although the Dealers counterclaimed under the Petroleum Marketing Practices Act, they abandoned this claim at the summary judgment hearing. Instead, the Dealers reframed the parties' disagreement on the meaning of "market withdrawal" within the context of the Petroleum Marketing Practices Act. The Dealers admitted that "we are not making a claim under the PMPA . . . the only thing we are using the PMPA [for] is one thing . . . [w]e are using it as a dictionary . . . [to define w]hat is market withdrawal," although the Petroleum Marketing Practices Act does not define "market withdrawal." Nonetheless, the Dealers said that the court must use the Petroleum Marketing Practices Act and cases interpreting it to analyze the term "market withdrawal" under the parties' contracts. Relying on the District Court of New Jersey's discussion of "market withdrawal" in the unpublished decision of *Florham Park Chevron, Inc. v. Chevron, USA, Inc.*, 1987 WL 17496 No. 87-4748 (D.N.J. Sept. 25, 1987), the Dealers argued that, because Shell assigned its contracts to the Wholesalers, it no longer has a "direct" relationship with the Dealers and, thus, has "withdrawn" from Detroit. Shell countered that its assignments to the Wholesalers did not constitute "market withdrawal" under the terms of the Petroleum Marketing Practices Act, the Brand Covenant, or the Retail Sales Agreement.

In its bench ruling, the district court contrasted Shell's continued presence in Detroit with Chevron's withdrawal from the Northeast United States market in *Florham Park*, and then agreed with Shell. Consequently, the district court granted partial summary judgment to Shell and awarded it attorneys' fees. The Dealers timely filed their notice of appeal.

## II.  Legal Standard

On appeal, the Dealers challenge the district court's grant of partial summary judgment in favor of Shell with regard to the validity of the Brand Covenant and the award of attorneys' fees to Shell.  "We give fresh review to a district court's summary-judgment decision, applying the same familiar standard that district courts apply."  *Flaskamp v. Dearborn Pub. Schs.*, 385 F.3d 935, 940 (6th Cir. 2004).  We review "a decision regarding the award of attorney's fees for an abuse of discretion." *Nichols v. Muskingum Coll.*, 318 F.3d 674, 682 (6th Cir. 2003).

## III.  Analysis

### A. The District Court Correctly Granted Shell Partial Summary Judgment

For the reasons discussed below, we affirm the district court's finding that Shell's assignment of the Retail Sales Agreements to the Wholesalers did not result in a "market withdrawal" under the Brand Covenant provision in the Special Warranty Deed.

The Dealers say the district court erred when it granted Shell's motion for summary judgment concerning the on going validity of the Brand Covenant following Shell's assignments of the Retail Sales Agreements to the Wholesalers.  As described, the Brand Covenant excuses the Dealers' obligations to purchase Shell-branded gasoline where Shell has withdrawn from the Detroit market. The Dealers claim that Shell's assignments of the Retail Sales Agreements to the Wholesalers represent a "market withdrawal" under the Petroleum Marketing Practices Act.  The Dealers reason that, because Shell no longer directly supplies them with gasoline, Paragraph 2(f) of the Brand Covenant excuses their continued performance of their retail sales obligations to Shell.

Not true.  Shell's assignments of the Retail Sales Agreements to the Wholesalers do not

effectuate a "market withdrawal" under the Petroleum Marketing Practices Act. The district court correctly found that "Shell has not left the marketplace as defined in the contract."

The Dealers purchased their service stations from Shell subject to the Brand Covenant's condition that, "if the Premises are used for the sale of motor fuel, the motor fuel must be purchased from [Shell], or [Shell's] successor or assigns, ("Brand Covenant") and Retailer's station must be operated pursuant to the terms and conditions of the Retail Sales Agreement, or its replacement." The contracts excuse the Dealers' obligations to Shell only when Shell undertakes "a market withdrawal in accordance with the Petroleum Marketing Practices Act" from metropolitan Detroit.

The Petroleum Marketing Practices Act does not define "market withdrawal." Instead, Congress left the interpretation of "market withdrawal" to the courts. In interpreting "market withdrawal" the Dealers rely on *Florham Park*. We find *Florham Park* easily distinguishable. Both the plain language of the Brand Covenant and the parties' stipulations support our holding that Shell has not withdrawn from the Detroit market.

Beginning with the stipulated facts, the parties agree that Shell continues to market Shell-branded gasoline to consumers throughout metropolitan Detroit. The parties also agree that the relevant "market" includes metropolitan Detroit. The parties' stipulations include their recognition that, pursuant to its contractual relationships with the Dealers and the Wholesalers, "Shell [does and] will supply its Shell-branded gasoline to Shell-branded wholesalers who, in turn, [do and] will supply Shell-branded gasoline to the Shell-branded retailers within the metropolitan Detroit market." Thus, the Dealers admit that Shell maintains an active presence in metropolitan Detroit's gasoline market. Rather than demonstrate a "withdrawal" from the Detroit market, Shell's contractual

obligations with the Dealers and with the Wholesalers represent the company's on going commitment to sell Shell-branded gasoline in Detroit through the Shell-branded Dealers. Thus, the Dealers's assertion to the contrary fails.

Further, based on the plain language of the Brand Covenant and the Retail Sales Agreement, Shell's altered distribution strategy does not constitute a "market withdrawal." The Dealers attempt to argue that Shell has undertaken "market withdrawal" from metropolitan Detroit because Shell no longer "directly" supplies them with Shell-branded gasoline. This position ignores the plain language of the parties' agreement and the facts of the case.

First, Shell's contracts with the Wholesalers obligate the companies to sell and buy, respectively, monthly minimum amounts of Shell-branded gasoline for distribution to Shell-branded service stations, including those of the Dealers. Shell's assignment of the Retail Sales Agreements to the Wholesalers further requires both Shell and the Wholesalers to ensure that the Dealers receive sufficient quantities of Shell-branded gasoline. Shell retains the power to "de-identify" either of the Wholesalers or any Dealer that does not comply with Shell's brand quality standards. Thus, Shell continues to "promote" and "sell" Shell-branded gasoline in the metropolitan Detroit market. Shell continues to manage its contracts with the Wholesalers and Dealers, including its assignment of the Retail Sales Agreements, as a part of its efforts to meet its Detroit customers' needs. Consequently, and as correctly noted by the district court, "Shell has not left the marketplace as defined in the contract."

Second, the effect of Shell's assignment of the Retail Sales Agreements to the Wholesalers does not constitute a contractual "market withdrawal." At the summary judgment hearing, the

Dealers exclusively relied on the New Jersey district court's unpublished decision in *Florham Park* to support their invocation of Paragraph 2(f) of the Brand Covenant. However, in their application of *Florham Park* to the facts at hand, the Dealers reflect a misunderstanding of the New Jersey district court's legal analysis and of the court's holding.

In *Florham Park*, eighteen Gulf-branded service station franchise operators sued Chevron for violations of the Petroleum Marketing Practices Act. *See* 1987 WL 17496, at \*1-2. The *Florham Park* dealers alleged that Chevron's sale of its operations in the Northeast market and assignment of dealer contracts to Cumberland Farms constituted a statutory termination of the dealers's franchise agreements under the PMPA. *Id.* Thus, *Florham Park* focused on the after-effects of Chevron's sale of assets, i.e., withdrawal from the Northeast market and assignment of franchise agreements to Cumberland Farms. *Id.* These transactions wholly removed Chevron from any participation in the sale of Gulf-branded gasoline in the Northeast market. At the close of its deal with Cumberland Farms, Chevron retained no legal control over the supply, trademark, or franchise of Gulf-branded gasoline in its former markets of New Jersey, Delaware, or Pennsylvania. Finally, Chevron evidenced its intent to exit the Northeast in a letter sent to all Gulf dealers stating its "determination to withdraw from the marketing of motor fuels through retail outlets" by selling its Gulf-branded assets to Cumberland Farms. *Id.* at \*2.[2] The Gulf dealers argued that Chevron's withdrawal from

---

[2] Other courts, including this Court, have criticized the *Florham Park* decision. *See May-Som Gulf, Inc. v. Chevron U.S.A., Inc*, 869 F.2d 917, 922 n.3 (6th Cir. 1989) (noting that "[w]e find the *Florham Park I* decision to be problematic . . .."). *See also Ackley v. Gulf Oil Corp.*, 726 F. Supp. 353 (D. Conn.), *aff'd*, 889 F.2d 1280 (2d Cir. 1989). Indeed, after *May-Som* and *Ackley*, the *Florham Park* court reversed itself, finding that the assignment in *Florham Park* did not violate the PMPA. *See Florham Park Chevron, Inc. v. Chevron, U.S.A., Inc.*, No. 86-4748, 1987 WL 19492 (D.N.J. Nov. 4, 1987).

the Northeast impermissibly ended their franchise relationship with Chevron.

Contrary to the Dealers' argument, Shell maintains a vastly different position in the metropolitan Detroit market than that maintained by Chevron in the Northeast after its transactions with Cumberland Farms. Following its asset sale and trademark agreements with Cumberland, Chevron had exited the petroleum retail market in the Northeast. In contrast, Shell continues to market its Shell-branded gasoline through the Dealers in Detroit. Under the terms of its agreements with the Wholesalers, Shell sells gasoline to them expressly for the branding and resale of the motor fuel through pre-approved Shell-branded retail outlets, including those of the Dealers. Shell's agreements with the Wholesalers require True North and Wakefield Oil to purchase and deliver minimum monthly amounts of Shell-branded gasoline to the Shell-branded service stations, including those of the Dealers. Shell, not the Wholesalers, determines which retail outlets may sell its gasoline. Only Shell-branded gasoline may be sold at the Shell-branded service stations. Shell retains the right to market Shell-branded gasoline throughout Detroit, either through its own retail outlets or the Dealers' service stations. Unlike Chevron's use of a formal "market withdrawal" letter, Shell's communications with the Dealers show the company's commitment to marketing gasoline in Detroit. In short, *Florham Park* presents facts and legal outcomes inapposite to this case. Thus, the Dealers unpersuasively invoke *Florham Park* to excuse their contractual performance in this case.

Based on the parties' stipulations, the contracts' plain language, and *Florham Park*, we hold that the district court correctly concluded that "Shell has not left the marketplace."

### B. The District Court Correctly Awarded Attorneys' Fees to Shell

The Dealers next say that the district court abused its discretion in granting Shell's motion for attorneys' fees. Not so. Federal courts may award attorneys' fees to a prevailing party when a contract authorizes such a recovery. *See, e.g.*, *Miller v. Alldata Corp.*, 14 Fed. Appx. 457, 468 (6th Cir. 2001) (citing *Hall v. Cole*, 412 U.S. 1, 4-5 (1973)).

The parties' contracts provide that the "prevailing party will be entitled to recover from the other party reasonable attorney's fees and other legal costs the party incurs in order to secure, defend or protect the rights inuring to the prevailing party under this Agreement, or to enforce the terms thereof." Here, Shell prevailed below and does so again upon appeal. As the "prevailing party," Shell is entitled to attorneys' fees. Thus, the district court properly awarded attorneys' fees to Shell.

## IV. Conclusion

For these reasons, we **AFFIRM.**